UNITED STATES of America,
Plaintiff-Appellee,
v.
Terry Mason GRIMES, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,
v.
Robert Allen MASSEY, Defendant-
Appellant.

Nos. 20369, 20370.

United States Court of Appeals,
Sixth Circuit.

Feb. 24, 1971.

Certiorari Denied May 17, 1971.
See 91 S.Ct. 1684.

H. Fred Hoefle, Cincinnati, Ohio (Court-appointed) for defendants-appellants.

Robert A. Steinberg, Asst. U. S. Atty., Cincinnati, Ohio, for plaintiff-appellee; William W. Milligan, U. S. Atty., Dayton, Ohio, on brief.

Before PHILLIPS, Chief Judge, MILLER, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

Appellants Grimes and Massey were convicted in the court below of forcibly breaking into a post office with the intent to commit larceny therein, in violation of 18 U.S.C. § 2115 (1964). On appeal, appellants raise two issues, both concerning the defense of entrapment. Appellants first contend that the jury's verdict on entrapment was contrary to the manifest weight of the evidence. Secondly, relying on Williamson v. Unit-

ed States, 311 F.2d 441 (5th Cir. 1962), appellants argue that their conviction should be reversed because the government informer who participated in the offense and testified against the appellants was paid on a contingent fee basis. Before considering these issues, it is necessary to relate the facts with some degree of specificity.

## A. THE FACTS

At 2:00 A.M. on August 19, 1969, the Newtown, Ohio, branch of the United States Post Office was burglarized by several men. One of these, Charles Sizelove, a government informer who had been promised reimbursement for his expenses and a "reward" of $200 for each conviction he made possible, forced open the top half of a double door leading to the interior of the post office. He then reached inside and opened the bottom half of the door, admitting appellant Massey who carried a bag filled with assorted burglary tools. After some time, Sizelove opened the same door and let in appellant Grimes who brought a large metal bar to be used in cracking the safes. The three men then approached two safes. Grimes "worked on" one of these. Later, Sizelove told the appellants that he had heard a police radio. Since he was carrying a gun, Sizelove left to investigate the noise.

Sizelove went directly to a secret observation gallery and met with Postal Inspector Anderson and other law enforcement officers. The authorities then proceeded to the floor of the post office and arrested the appellants. A short time later they arrested Terry Kahrs, driver of the "getaway car" that the local sheriff's office had secretly provided Sizelove.

Because of the contradictory statements of the witnesses, it is difficult to ascertain what transpired at all times in the weeks before the burglary. It is not disputed that Sizelove first met with Inspector Anderson on July 30, 1969, when Sizelove reported that two people he had met at a tavern were talking about burglarizing a post office. Al-though neither appellant was mentioned at that time, Inspector Anderson had previously received information connecting both appellants with other burglaries.

On either August 1 [according to Sizelove (T. 35)] or August 17 [according to appellant Grimes (T. 239)], Sizelove arranged to be introduced to appellant Grimes by Vance, a mutual friend. Using the alias "Chuck Martin," Sizelove represented himself as an itinerant criminal.

Sizelove testified that at his initial meeting with appellant Grimes on August 1, appellant Grimes first brought up the matter of burglary, asking Sizelove and Vance if they were interested in a burglary. Both Sizelove and Vance expressed an interest in appellant Grimes' suggestion. According to Sizelove, the three of them then cased a post office and a courthouse as possible sites for a burglary. During the tour, appellant Grimes supposedly stated that he was a professional burglar and could "take" just about any safe.

Sizelove further testified that the next few days he and appellant Grimes had additional discussions on the merits of burglarizing a post office. Sizelove testified that on August 16, he talked with appellant Grimes again. Sizelove indicated that he did not like the three post offices they had surveyed the day before. Appellant Grimes then asked Sizelove about the Newtown Post Office. After casing this post office, Sizelove's testimony is that he agreed that Newtown was an acceptable target for a burglary. On August 17, Sizelove, according to his testimony, was told by appellant Grimes that they would burglarize the Newtown Post Office the next day since both of them liked it. The next day they met again to make preparations for the burglary. Appellant Grimes introduced Sizelove to appellant Massey, stating that Massey "would go on the burglary with us."

Appellant Grimes at trial disagreed with much of Sizelove's statement of the facts. He testified that he first met

Sizelove on August 17. At that meeting Sizelove asked him if he would like to participate in some burglaries. Appellant Grimes stated that he refused this and subsequent offers, despite Sizelove's offer to pay $1000 if appellant Grimes would just "ride along" to the burglary. Appellant Grimes testified that he rejected these offers because he "didn't want to get in any more trouble." Despite his sentiments, appellant Grimes said that he finally agreed to accompany Sizelove on the burglary, but not as a "participant."

Both Sizelove and appellant Grimes testified that Grimes asked Terry Kahrs to drive the getaway car, but they disagreed as to who offered to pay Kahrs for his services. Kahrs himself testified that Sizelove was not even present when appellant Grimes hired him (Kahrs) and set the amount he would receive.

Sizelove and appellant Grimes also disagreed on whose tools were used for the burglary. Sizelove testified that the tools were obtained from a small shed near Grimes' house. Grimes, however, maintained that the tools belonged to Sizelove.

Sizelove and appellants further differ on who engineered the burglary. According to Sizelove, appellant Grimes suggested the site and organized the burglary. Appellant Grimes, on the other hand, testified that Sizelove was instigator and leader of the burglary. At the trial Inspector Anderson stated that to his knowledge Sizelove had never set up a burglary. In fact, Inspector Anderson testified that Sizelove had been given explicit instructions that he was never to set up any post office burglary or any other burglary.

Similarly, the jury was presented with contradictory evidence of appellant Grimes' predisposition to commit a burglary. Sizelove testified that Grimes first mentioned a burglary, suggested and cased several possible sites, referred to himself as a professional burglar and thief, had hidden burglar tools, and had used a certain metal bar as his "burglary specialty." Inspector Anderson testified that he had information connecting both appellants with other burglaries. Appellant Grimes, however, stated that until he met Sizelove he had never formulated any plans to burglarize anything. Grimes' wife also testified that she had never known him to commit a crime.

## B. WEIGHT OF THE EVIDENCE

 Appellants first argue that the jury's verdict on entrapment was contrary to the manifest weight of the evidence. We do not agree. In American jurisprudence it is recognized that a person cannot be convicted if he was unlawfully entrapped; that is, induced by government agents to commit a crime which he was not predisposed to commit. See e. g., Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); United States v. Baxter, 342 F.2d 773 (6th Cir.), cert. denied, 381 U. S. 934, 85 S.Ct. 1766, 14 L.Ed.2d 699 (1965); United States v. Head, 353 F. 2d 566 (6th Cir. 1965). In determining whether an entrapment is present, courts look both to the conduct of the government agent and predisposition of the accused. Sherman v. United States, *supra.* Although entrapment may become a question of law when the facts are undisputed, ordinarily, as here, it is a question of fact which must be submitted to the jury. Goss v. United States, 376 F.2d 812 (5th Cir. 1967); United States v. Head, *supra,* 353 F.2d at 568. The jury in this case was presented with conflicting testimony on virtually every element necessary to establish entrapment. It could have found either the presence or absence of unlawful entrapment, depending on testimony it chose to believe.[1] The jury's verdict

1. The testimony indicating that appellant Grimes had previously committed burglaries and was the perpetrator of the Newtown Post Office burglary distinguishes the instant case from this Court's decision in Morei v. United States, 127 F.2d 827 (6th Cir. 1942).

in this action demonstrates that it resolved the factual conflict against the appellants. United States v. Curtis, 430 F.2d 1159 (6th Cir. 1970). It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence to support it, taking the view most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

## C. CONTINGENT FEE ARRANGEMENT

■ Appellants also argue that the government violated due process in hiring a paid informer on a contingent fee arrangement. This contention is based on Williamson v. United States, 311 F.2d 441 (5th Cir. 1962), where the Fifth Circuit noted that a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed "might tend to a 'frame up,' or to cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration." *Id.* at 444. Accordingly, using its supervisory power over the administration of criminal justice in federal courts, McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the Fifth Circuit held that in the absence of a justification or an explanation for a contingent fee arrangement, a conviction is invalid if based on evidence of informers hired under such an agreement to produce evidence against a particular named defendant as to crimes not yet committed. Concurring, Judge Brown argued that the case did not concern an aspect of entrapment. Rather it merely dealt with means which are essentially revolting to an ordered society. 311 F.2d at 445. Judge Cameron, in his dissent, noted that the effect of the contingent fee arrangement on the informer's credibility should be left to the jury. *Id.* at 446.

After a review of the reported cases in which *Williamson* is discussed, we do not find that the *Williamson* rule should be applied in the Sixth Circuit.

Although frequently cited, *Williamson* has been criticized see, e. g., Comment, 49 U.Va.L.Rev. 1021 (1963), and distinguished or diluted by the Fifth Circuit in subsequent cases. See Comment, 41 U.Colo.L.Rev. 261, 264–66 (1969). In Hill v. United States, 328 F.2d 988 (5th Cir.), cert. denied, 379 U.S. 851, 85 S.Ct. 94, 13 L.Ed.2d 54 (1964), for example, the Fifth Circuit found sufficient justification for a contingent fee arrangement where the accused had a past record and where neighbors had complained of the accused's activities to a government agent.

Similarly, in Sears v. United States, 343 F.2d 139 (5th Cir. 1965), the Fifth Circuit found that *Williamson* approved a contingent fee arrangement if federal agents had knowledge that the particular defendant was engaged in illegal dealings, or if the informer, after careful instructions, understood the rules against entrapment.

In numerous other cases the Fifth Circuit has also distinguished *Williamson. See, e. g.,* Bullock v. United States, 383 F.2d 545 (5th Cir. 1967); Harris v. United States, 400 F.2d 264 (5th Cir. 1968); United States v. Durham, 413 F.2d 1003 (5th Cir.), cert. denied, 396 U.S. 839, 90 S.Ct. 100, 24 L.Ed.2d 89 (1969).

No other circuit has expressly followed *Williamson.* In United States v. Smalls, 363 F.2d 417 (2d Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967), the court refused to accept *Williamson* as controlling. The court decided to "leave for another day the knotty problems posed by an attempt to put limits on the use of an informer by those who fight the ugly business of peddling narcotics—whether by expansion or change in the doctrine of entrapment as presently developed or by other methods. *Id.* at 420.

The Ninth Circuit has also distinguished *Williamson*. In Corcoran v. United States, 427 F.2d 16 (9th Cir. 1970), the court, giving *Williamson* a strict construction, found on the facts there presented that there was no contingent fee arrangement. As a result, the court noted that "[t]his court is not here presented with the problem reviewed in *Williamson* \* \* \* ." *Id.* at 18.

The Tenth Circuit avoided following *Williamson* in Maestas v. United States, 341 F.2d 493 (10th Cir. 1965). The court read *Williamson* to require the government to show some " 'justification or explanation' for using a 'special employee' to produce evidence, and not to [require] a 'justification or explanation' for paying such an employee on a contingency basis." *Id.* at 495. Despite this effort to construe Williamson, the Tenth Circuit, if anything, undercut the theoretical bases of that case by noting that "[w]ith a contingency fee arrangement with an informer, the likelihood that an entrapment will result is *probably* greater than otherwise, hence it may demand that the circumstances be examined more carefully by the trial court." *Id.* at 495 (emphasis added).

Our research has shown that only one court other than the Fifth Circuit has expressly approved the *Williamson* view. In United States v. Curry, 284 F.Supp. 458 (N.D.Ill.E.D.1968), the district judge in dictum accepted *Williamson* as controlling, but gave no authority or reason for his conclusion. *Id.* at 470.

On several occasions this court has also been presented with an alleged contingent fee agreement, but in each instance the *Williamson* case has been distinguished. *See, e. g.*, United States v. Baxter, 342 F.2d 773 (6th Cir.) cert. denied, 381 U.S. 934, 85 S.Ct. 1766, 14 L. Ed.2d 699 (1965); United States v. Costner, 359 F.2d 969 (6th Cir. 1966). Here, however, we feel that it is unnecessary to search the record for a significant distinction since we are convinced that the *Williamson* doctrine should not be approved for this circuit. In United States v. Costner, *supra*, the informer was in jail awaiting prosecution when federal agents hired him to apprehend other moonshiners. He was to be paid expenses plus a reward proportionate to the number of people sought as a result of his efforts. We did not consider the merits of *Williamson* because in *Costner* the contingent fee was not to be paid for the conviction of a specified individual. As authority for distinguishing *Williamson*, we cited United States v. Baxter, *supra*, where we said: "The method of paying the informers might raise questions as to their credibility and the weight to be given to their testimony but it would not invalidate the testimony." 342 F.2d at 774. We now hold that the same rule should be applied even when all of the factors noted in *Williamson* are present.

Our refusal to use our supervisory power over federal criminal proceedings so as to apply the exclusionary rule in this case finds support in observations by the United States Supreme Court. In Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), the Supreme Court stated that "the court's inherent power to refuse to receive material evidence is a power that must be sparingly exercised." *Id.* at 440, 83 S.Ct. at 1388. The court observed that:

> The function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant. Proper fulfillment of this function requires that, constitutional limitations aside, all relevant, competent evidence be admissible, unless the manner in which it has been obtained—for example, by violating some statute or rule of procedure—compels the formulation of a rule excluding its introduction in a federal court. *Id.*

No such overriding policy is present when an informer is paid on a contingent fee agreement for the conviction of specified persons for crimes not yet committed. Although it is true that the informant working under this type of

arrangement *may* be prone to lie and manufacture crimes, he is no more likely to commit these wrongs than witnesses acting for other, more common reasons. Frequently, for example, one co-defendant testifies against another co-defendant with the expectation of favorable treatment as a reward for his testimony.[2] Like the informant being paid on a contingent fee basis, a co-defendant so testifying may feel it imperative to obtain a conviction of his co-defendant in order to improve his own position. Similarly, informants paid on bases other than a contingent arrangement may feel that their employment will be terminated if they do not bring about a conviction. Therefore, despite admonitions to the contrary, they may believe that their future employment as an informant depends on the manufacture of crimes in order to prove their worth to the government. Neither of these methods of "paying" informers has been seriously attacked by the courts; yet the potential for abuse is obvious in each case. Rather than adopting an exclusionary rule for a particular factual situation, irrespective of the mode of payment, we prefer the rule that would leave the entire matter to the jury to consider in weighing the credibility of the witness-informant. *Cf.* Heard v. United States, 414 F.2d 884 (5th Cir. 1969). In our view this approach provides adequate safeguards for the criminal defendant against possible abuses since the witness must undergo the rigors of cross-examination.

Congress itself has authorized a form of contingent fee arrangement in certain cases. For example, an informer whose information leads to a conviction for violation of a revenue law may be awarded up to one-half of any fine levied as a result of that conviction. Internal Rev. Code of 1954, § 7214(a). *Cf. Id.* § 7623.

It is well-recognized that informers are an important and necessary aspect of our system of criminal justice. Although some critics view the difficult fight against crime as a game, we take a different view. "We are not persuaded that the impeccable manners and sportsmanship that would characterize dealings between members of the Westchester Saddle and Cycle Club must be exhibited by all federal agents when dealing with criminal suspects." United States v. Costner, 359 F.2d at 973.

Affirmed.

---

2. In the case at bar, for instance, Terry Kahrs, driver of the getaway car, had pled guilty and was awaiting the imposition of sentences when he testified on behalf of the government.