**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leon JACKSON, Defendant-Appellant.**

No. 76–1124.

United States Court of Appeals,
Sixth Circuit.

Aug. 3, 1976.

William R. Coppel, Flint, Mich. (Court-appointed), for defendant-appellant.

Ralph B. Guy, Jr., U. S. Atty., Robert D. Sharp, Asst. U. S. Atty., Detroit, Mich., John Patrick Conley, Flint, Mich., for plaintiff-appellee.

Before WEICK and LIVELY, Circuit Judges; and LAMBROS,* District Judge.

LIVELY, Circuit Judge.

This is an appeal from convictions on three charges of sale and distribution of heroin and cocaine in violation of 21 U.S.C. § 841(a)(1). The transactions were admitted by the defendant, but he contended that the activities of the undercover narcotics agents who were involved in the three transfers constituted entrapment. The case was heard by the court after the defendant waived his right to trial by jury. The defendant argues on appeal, as he did in district court, that entrapment was proven as a matter of law and that he was entitled to a judgment of acquittal.

Shortly after Jackson was released from prison an inmate who had been friendly with him gave Jackson's name to a drug enforcement agent and notified Jackson that the inmate's cousin would contact him about the purchase of narcotics. An undercover agent, Melvin Smith, posing as the cousin of Jackson's prison acquaintance talked with Jackson on the telephone after making several attempts to reach him. The agent asked whether Jackson could supply cocaine and Jackson replied, "It's possible." In this conversation Jackson stated that the narcotics requested by the caller were "in the pocket now." A tape recording of this telephone call was played at the trial.

Several weeks after the first telephone conversation Jackson met agent Smith at a restaurant in Flint, Michigan and delivered small samples of cocaine and heroin to him. Later that day the agent called Jackson and stated that he wanted to buy cocaine and heroin. At the appointed time the drugs were delivered by Leroy Adams rather than Jackson and later in the evening agent Smith called Jackson and said that he wanted to deal with him directly. The tape recording of this telephone call was also played. The recording disclosed that when the agent complained because Adams had insisted on receiving payment prior to delivery of narcotics, Jackson said that this was "the normal way." Several weeks after this recorded conversation agent Smith purchased heroin from Jackson while they were sitting in an automobile in Flint. The deliveries of cocaine and heroin at the restaurant were the bases of counts one and two and the delivery of the heroin in the automobile was the transaction referred to in count three of the indictment.

Melvin Smith testified that during one of his conversations with Jackson the defendant told him that he would take him (the agent) under his wing and show him how to make money in the drug trade. This conversation occurred on the same day that the first transfers of cocaine and heroin were made. The agent testified also that during a later conversation Jackson told him that a former fellow inmate was his "prime source" in California.

Jackson took the stand and testified that shortly after his release from prison he received a letter from a prison acquaintance named Kenneth Smith asking him to cooperate with "Kenneth's cousin," the undercover agent, Melvin Smith. He said that he then began getting calls from Melvin Smith, but did not respond because he was

---

* The Honorable Thomas D. Lambros, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

in no position to help Kenneth Smith who needed money. He testified that agent Smith repeatedly talked about the need of Kenneth Smith to obtain some money and that before the last transfer of drugs agent Smith told him that Kenneth Smith had died in prison and that he was trying to raise some money for his funeral. He testified that he sold drugs to agent Smith at a discount to help Kenneth Smith and that he did not profit from the transactions.

Jackson stated that he had not attempted to buy or sell narcotics between the time he was released from prison and the contact by agent Smith, and then testified as follows on direct examination:

Q I take it, then, when you said that you knew of people in the Flint area or elsewhere where narcotics could be obtained, is that right?

A At that time it was, I was having a little static in narcotics. There was a static that was coming out of Saginaw, Michigan, nothing was being able to be obtained, but some people had made certain products available and I remember saying "in the pocket now" or however you want to look at it. I have a pretty good name. I had ability to put my hands on something when I talked to Agent Smith. I must have had that at the time "in the pocket now." I was able to go get it when I wanted it. When certain transactions were made I went and made the initial contact and went back—

On cross-examination Jackson did not deny a predisposition to buy and sell drugs, but stated that he just hadn't been out long enough.

The district court made findings of fact, including the following:

The government agent involved here did not implant the criminal design in the mind of the defendant. Defendant was not induced by the government's agent to distribute narcotics, but rather defendant was predisposed to commit the acts above described. This finding is based upon the documentary evidence introduced and

testimonial evidence elicited at trial including that of the defendant, as well as all circumstantial evidence and the credibility of the witnesses.

In its conclusions of law the district court held that the defendant had not proved entrapment as a matter of law, that the issue was properly submitted to the court as a finder of fact and that "[t]he government has met its burden by showing beyond a reasonable doubt that the defendant had the predisposition to commit the unlawful acts above mentioned."

■ Since its decision in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the Supreme Court has consistently held that when the defense of entrapment is asserted, the focus of the inquiry is upon the predisposition of the defendant to commit the act with which he is charged. In *Sorrells,* Chief Justice Hughes, writing for the majority, stated:

It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. (citations omitted). The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute. *Id.* at 441–42, 53 S.Ct. at 212.

In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the opinion of Mr. Justice Rehnquist recites the history of the Supreme Court's treatment of the entrapment defense. In *Russell* the Court expressly declined to depart from the

established rule which focuses on the predisposition of the defendant and found that the defendant's concession of predisposition was fatal to his claim of entrapment. In the more recent case of *Hampton v. United States*, —— U.S. ——, 96 S.Ct. 1646, 48 L.Ed.2d 113, (1976), both the plurality opinion and the concurring opinion make it clear that predisposition of the defendant remains the relevant inquiry where entrapment is relied upon as a defense.

In *United States v. Ambrose*, 483 F.2d 742, 746 (6th Cir. 1973), this court wrote, ". . . only when undisputed facts establish that the criminal design originated with the Government agent, that the agent implanted in the mind of an innocent person the disposition to commit the offense, and that the defendant then committed the offense at the urging of the Government agent can we conclude that entrapment was established as a matter of law." (citations omitted).

In *United States v. Hairrell*, 521 F.2d 1264, 1267 (6th Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 568, 46 L.Ed.2d 409 (1975), we wrote,

> The defense of entrapment is not established as a matter of law by demonstrating that the government provided the opportunities or facilities for commission of the crime or that deceit was employed to induce a defendant to deal with government agents. If there is any showing of a predisposition on the part of the defendant to commit the crime, it is for the jury to determine whether the government agents actually implanted the criminal design in the mind of the defendant.

█ It is clear from the summary of evidence heretofore set out that this is not a case where the undisputed facts established entrapment as a matter of law. While agent Smith provided opportunities for commission of the illegal acts with which the defendant was charged and employed deceit to gain Jackson's confidence to in-

duce him to deal with the agent, this is not enough. There was evidence, both from agent Smith and the defendant himself, from which it could reasonably be inferred that Leon Jackson had a predisposition to deal in narcotics at the time of his first contact with agent Smith.

█ In *United States v. Head*, 353 F.2d 566 (6th Cir. 1965), the defendant was tried by the court without a jury. On appeal this court noted that ordinarily entrapment presents a question of fact which should be submitted to a jury and agreed with the district court that the evidence in that case presented a factual dispute. In affirming the conviction the court held:

> The finding of the district judge on the factual issue thus presented is supported by the evidence. We find no error on the part of the district judge in failing to find that there was entrapment as a matter of law. *Id.* at 569.

Upon examination of the entire transcript we find that a factual dispute did exist in the present case and that the findings of fact of District Judge James Harvey are not clearly erroneous, but are supported by substantial evidence.

We have carefully examined the cases relied upon by Jackson. In *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), the Court found entrapment as a matter of law based on "the undisputed testimony of the prosecution's witnesses." *Id.* at 373, 78 S.Ct. at 821. In that case the defense presented no witnesses and there were no conflicts in evidence or credibility questions to resolve. In *Morales v. United States*, 260 F.2d 939 (6th Cir. 1958), a finding of entrapment as a matter of law was based on a record in which the defendant testified without contradiction on cross-examination that he had no criminal record, that the undercover government agent, who did not testify at trial, repeatedly asked if he could get marijuana, that he told the agent he knew nothing about the

business, that he had never bought or sold marijuana before and had never considered dealing in it until the government agent started urging him to get some. It is obvious that the record in the present case presents an entirely different picture of the predisposition of Jackson to engage in narcotics traffic.

The judgment of the district court is affirmed.