774 F.2d 1163
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Robert Mitchell, Petitioner-Appellant,
v.
Justin Ravitz; Robert Facano; Attorney General State of
Michigan; and Dale E. Foltz, Respondents-Appellees.
 No. 85-1029
 United States Court of Appeals, Sixth Circuit.
 9/30/85
 
 E.D.Mich.
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
 BEFORE: JONES and WELLFORD, Circuit Judges; and HOGAN*, Senior District Judge.
 PER CURIAM.
 
 
 1
 Petitioner, Robert Mitchell, appeals from a denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254 by the United States District Court for the Eastern District of Michigan. We AFFIRM the district court's denial of the habeas corpus petition.
 
 I.
 
 2
 Petitioner, a former Detroit police officer, was indicted and convicted for his part in a broad drug conspiracy implicating several police officers. The alleged objective of the conspiracy was to share in 'huge profits' derived from the narcotics business within Detroit's Tenth Precinct.
 
 
 3
 Under Count I, petitioner was convicted of conspiracy to sell, manufacture, deliver, or possess with intent to sell narcotics in violation of Mich. Stat. Ann. Sec. 28.354(1). Count I charged that petitioner and other police officer defendants counselled, aided, and planned the setting up of narcotics establishments in exchange for money; aided the civilian traffickers by tipping them off when raids were to take place; worked with those traffickers to raid rival narcotics operators to secure money and narcotics and then recycled the narcotics so obtained through friendly operators; accepted money to allow friendly operators to remain undisturbed while raiding their competition. The prosecution also contended that the corrupt police officers set the ground rules for favored drug operations in Detroit's Tenth Precinct.
 
 
 4
 Petitioner was also convicted under Count II for conspiracy to obstruct justice in violation of Mich. Stat. Ann. Sec. 28.773. Under Count II, petitioner and the other defendants allegedly had conspired to obstruct justice through the commission of numerous crimes in support of the conspiracy to traffic in narcotics, as alleged in Count I.
 
 
 5
 Petitioner and the other defendant police officers asserted that they were scapegoats and victims of a politically motivated scheme by prosecutors and high-level police officers who sought to indict and convict petitioner and the other defendants to show success against extensive illegal drug trafficking in Detroit. Petitioner and other defendants contended that they had acted only in the furtherance of their authorized duties, and that the case against them was fabricated by the prosecution and officials in the police department.
 
 
 6
 Petitioner's conviction on both counts was affirmed by the Michigan Court of Appeals. People v. Iaconnelli, 112 Mich. App. 725, 317 N.W.2d 540 (1982). The Michigan Supreme Court denied leave to appeal. People v. Haslip, 417 Mich. 1045 (1983). Petitioner then filed with the U. S. District Court for the Eastern District of Michigan a petition for habeas corpus pursuant to 28 U.S.C. Sec. 2254, asserting that his fifth and fourteenth amendment rights to a fair trial had been violated. The district court denied the petition, finding no constitutional violations. Petitioner appeals from that denial of his petition for writ of habeas corpus.
 
 II.
 
 7
 Petitioner alleges that the state trial court's failure to instruct the jury on application of Mich. Stat. Ann. Sec. 18.1070(56)(3), repealed by 1978 Mich. Pub. Acts 368, ('[n]o liability' be imposed 'upon any authorized state, county or local official engaged in the lawful performance of his duties') constituted reversible error. Acknowledging that he gave narcotics to informants in exchange for information, petitioner argued that his actions were in furtherance of legitimate police goals. Petitioner claims that since the state court's instructions failed to present his theory of innocence to the jury, his right to a fair trial was denied. Petitioner was not convicted of the substantive offense of distributing narcotics, rather he was charged with conspiracy to deliver narcotics. The trial court essentially instructed the jury that if petitioner in good faith believed his actions were lawful then even though he was not authorized to deliver the drugs he could not be convicted of the illegal conspiracy.[1] Thus the trial court increased the burden upon the government by requiring that it not only prove that petitioner was not objectively authorized to deliver the drugs, but also that he subjectively thought he was authorized to deliver the drugs. In our view, the trial court appropriately instructed the jury on defendant's theory.
 
 
 8
 As a procedural matter, in any event, this court need not address petitioner's allegation on this point since the viability of the statutory exemption as a defense is a state law question. The Michigan Court of Appeals held that the trial court properly instructed the jury on state law. 317 N.W.2d 553-54. Proper interpretation of state law is within the province of state courts, and does not present a federal question. Combs v. Tennessee, 530 F.2d 695, 698 (6th Cir.), cert. denied, 425 U.S. 954 (1976). Thus, petitioner's claim of error based on the jury instructions is without merit.
 
 III.
 
 9
 Similarly, petitioner's claim that the state court's denial of his request for a bill of particulars denied him a fair trial presents a state law question and does not present a federal constitutional question. Combs, 530 F.2d at 698. In a similar case, the Michigan Supreme Court held that a bill of particulars was not required. People v. Tenerowicz, 266 Mich. 276, 287-88 (1934); accord People v. Jones, 75 Mich. App. 261, 268-69 (1977). Since a federal court may not review the decision of the state's highest court on state law,[2] Long v. Smith, 663 F.2d 18 (6th Cir. 1981), cert. denied, 455 U.S. 1024 (1982), the Michigan Supreme Court precedent does not require that petitioner be granted a bill of particulars.
 
 
 10
 Nor did the denial of petitioner's request for a bill of particulars deny him his due process right to notice. Watson v. Jago, 558 F.2d 330, 338 (6th Cir. 1977). Given the vast amount of information provided to petitioner by the prosecution, petitioner had sufficient notice. Thus, this contention is also without merit.
 
 IV.
 
 11
 Petitioner's primary contention is that six separate forms of prosecutorial misconduct when taken as a whole so prevaded the entire trial that he was denied his right to a fair trial. Petitioner cites the alleged instances of misconduct as 1) interjections of irrelevant and prejudicial matters into the case; 2) knowing use of perjured testimony; 3) intimidation of witnesses to compel them to plead the fifth amendment; 4) selective use of grant of immunity; 5) improper withholding of exculpatory evidence; and 6) unjustifiable cash payments to witnesses.
 
 A. IRRELEVANT AND PREJUDICIAL MATTERS
 
 12
 Petitioner cites as prejudicial the prosecutor's 'vouching' for the honesty and integrity of Lieutenant Bennett, who had been placed in charge of the investigation leading to the charges in this case; the prosecutor's inquiry into subjects unrelated to the facts at issue; and the prosecutor's misleading and prejudicial questions. While not a model of good prosecutorial conduct, these problems when taken in context do not rise to the level of reversible error especially in light of the court's curative instructions.
 
 
 13
 During his opening statement, the prosecutor made the following improper statement:
 
 
 14
 I believe [the police commissioner] will further testify that in order to achieve [a thorough and proper investigation] he picked a man to be in charge of that investigation. He picked a man who he felt could investigate thoroughly, honestly, with integrity, he picked a man, the then lieutenant George Bennett, now Deputy Chief George Bennett, who is seated at our table.
 
 
 15
 There was no objection to this statement. During her opening arguments, one defense attorney clearly alluded to political motivations as underlying the investigation:
 
 
 16
 I don't think you'll be able to avoid finding, or feeling that the picture being put together is as much, if not more about the people who are presenting the case, the police investigators, the prosecutors, the Organized Crime Task Force, and the witnesses as it is about the defendants
 
 
 17
 .............................................................
 
 
 18
 ...................
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 I think what the evidence will show is a group of men, one more motivated than the others, . . . who from the beginning sought the end result, and that because of that preconceived nature of the quest, he could not help but to mold and shape the testimony . . . and the statements of the witnesses he interviewed . . .. When [these witnesses] smelled the political motives, the aspirations . . . [i]t's not surprising that these men grasped . . . at a chance to get out.
 
 
 23
 Petitioner's attorney followed this line of attack with the following statements:
 
 
 24
 I think the facts are going to show that they prosecuted a group of men [defendant police officers] that by their positions, by their low rank, could not, would not, but wished they would have had access to major narcotics dealers. I think the facts are going to show that these men tried through the junkies, the prostitutes, and through the low-level narcotics people . . . to go higher up the ladder and get higher people in the narcotics underworld in the city of Detroit. And I believe that the facts will show . . . that that might be a reason for this prosecution. Not because they were bad cops, but because they were good cops. They were doing a good job, not a bad job.
 
 
 25
 Another defense attorney specifically addressed the prosecution's characterization of Lieutenant Bennett, after a particularly scathing attack upon the prosecution's motives:
 
 
 26
 Much of what has come to pass in this case . . . results from many, many [sic] political power struggle, the need for recognition on the part of certain people. The mere fact that police, and prosecutor bureaucrats are very similar to politicans in fact, they are politicans. They must justify their existence, and perpetuate their future. And in fact this can be more easily accomplished when you scream police corruption . . .. That kind of prosecution . . . shortens the long road to promotion. It also feeds insatiable egos.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 John Nichols, the former police commissioner for the police department in the city of Detroit, appointed Mr. Bennett to begin this super secret investigation in the Tenth Precinct for his honesty and integrity. That's not so . . .. Mr. Bennett was appointed because he was a militant, because he was black, and because Nichols, who is white, couldn't get into any political trouble by appointing him. . . .. And the evidence will disclose that he doesn't have that much integrity; that he isn't all that honest; that he has done a lot of things in this case that he shouldn't have done.
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 The prosecutor [sic] team is either involved in this conspiracy up to their necks, or they chose to ignore it because it serves their own purposes. The defense theorizes that little of the both [sic] may be true.
 
 
 33
 At the outset, it is unclear whether the prosecutor's statement was indeed a comment of his views on the veracity of Lieutenant Bennett. He was speaking about what the evidence would show, specifically what commissioner Nichols would say, about why Bennett was chosen to head the investigation. Indeed, Nichols did testify that Bennett was chosen because of his reputation for honesty and integrity.
 
 
 34
 Assuming that this statement was a comment on the witness' veracity, this isolated statement during the course of a six month trial did not deprive petitioner of the right to a fair trial especially in light of the implications that the prosecution had been instituted in bad faith. Compare Lawn v. United States, 355 U.S. 339 (1958), where the prosecutor stated 'we vouch for [two government witnesses] because we think they are telling the truth.' Id. at 359-60 n.15. The Supreme Court did not find the statement improper because of defense counsel's claim that the prosecution had been instituted in bad faith and because the prosecutor did not imply that his statement was based on personal knowledge.
 
 
 35
 The district court, furthermore, found the statement in question, even if error, to be harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18 (1967). We do not find this conclusion to be erroneous under all the circumstances.
 
 
 36
 Petitioner also claims that 'throughout' the trial the prosecution raised questions concerning subjects unrelated to the facts at issue. For example, the prosecution alluded that one 'Slim' had been shot and killed; that the step-son-in-law of an indicted co-conspirator, George Dudley, was currently in the penitentiary;[3] and that Milton Battle, an unindicted co-conspirator, had not been released upon his agreement to testify and then put back into jail when he would not testify.[4]
 
 
 37
 In view of the length of the trial, the prosecutor's conduct, which happened only rarely, did not render the trial fundamentally unfair and did not deny petitioner's due process rights. Donnelly v. DeChristoforo, 416 U.S. 637 (1974); Angel v. Overberg, 682 F.2d 605 (6th Cir. 1982).
 
 B. KNOWING USE OF PERJURED TESTIMONY
 
 38
 Petitioner claims the government knowingly permitted the introduction of perjured testimony in the trial, and therefore contends his convictions should be set aside as adversely affecting the jury, citing Giglio v. United States, 405 U.S. 150, 154 (1972), and Burks v. Egeler, 512 F.2d 221 (6th Cir. 1975), cert. denied, 423 U.S. 937 (1976).
 
 
 39
 The perjured testimony of which petitioner complains is that of prosecution witness 'Peaches' Miles, who was an alleged prostitute and heroin addict. She testified that she no longer used narcotics, but apparently still did and may have actually suffered withdrawal symptoms during the trial. In addressing this issue, the state appellate court found:
 
 
 40
 Contrary to defendants' contention, the record does not show that the prosecution was aware of the fact [that Miles was still using narcotics at the time of trial]. It appears that the prosecution cooperated in uncovering the information, and the information was dramatically put before the jury outside of the normal order of presentation of testimony to the benefit of defendants.
 
 
 41
 317 N.W.2d at 547. This factual finding is entitled to a presumption of correctness. Sumner v. Mata, 449 U.S. 539, 545-56 (1981). Indeed, Miles' recent use of narcotics was brought out at trial. It is difficult, therefore, to see what prejudice could have resulted from her denials of narcotics use.
 
 C. INTIMIDATION OF WITNESSES
 
 42
 Petitioner claims a due process violation arising from that prosecution's reminding a defense witness of his fifth amendment rights during defense counsel's direct examination, after which the witness selectively exercised his right to remain silent. When viewed in its full context, however, it is clear that the asserted error, if it was error, was harmless.
 
 
 43
 Craig Pollard, a Detroit police officer,[5] testified at length on behalf of defendants. Pollard testified extensively until the following exchange occurred:
 
 
 44
 DEFENSE COUNSEL: Did you ever give narcotics to informants for [sic] exchange for information?
 
 
 45
 POLLARD: Yes, sir.
 
 
 46
 DEFENSE COUNSEL: To your knowledge did anyone else ever do that?
 
 
 47
 PROSECUTOR: At this time, I would ask the Court to instruct the witness any further testimony in this area--advice him of his rights.
 
 
 48
 COURT: Let me excuse the jury for a moment . . .. Any objection to my so advising, [Mr. defense counsel]?
 
 
 49
 DEFENSE COUNSEL: I think it's unnecessary.
 
 
 50
 COURT: Any objection?
 
 
 51
 DEFENSE COUNSEL: Not really.
 
 
 52
 The court then advised Pollard of his fifth amendment rights. When the jury returned, the court asked defense counsel to proceed and defense counsel immediately turned Pollard over to the prosecution for cross-examination.
 
 
 53
 On cross-examination, Pollard invoked his fifth amendment right on a few occasions, but answered a number of other questions:
 
 
 54
 [PROSECUTION]: I think the last answer that you gave was that you had given narcotics to informants?
 
 
 55
 [POLLARD]: I'd like to stand on my Fifth Amendment rights at this point, Mr. [Prosecutor].
 
 
 56
 [PROSECUTION]: How many times did you give narcotics to informants?
 
 
 57
 [POLLARD]: I can only remember one specific incident.
 
 
 58
 [PROSECUTION]: Did you have a license to give narcotics at that time?
 
 
 59
 * * *
 
 
 60
 * * *
 
 
 61
 [PROSECUTION]: Mr. Pollard, what was the type of dope that you gave, or narcotics, that you gave this informant?
 
 
 62
 [POLLARD]: I'd like to once again invoke my Fifth Amendment privilege, Mr. [Prosecution].
 
 
 63
 [PROSECUTION]: All right. Let me ask you this: Did you record this transaction on a preliminary complaint report?
 
 
 64
 [POLLARD]: I'd like to once again invoke my Fifth Amendment.
 
 
 65
 [PROSECUTION]: All right. Stepping away from your own conduct, did you observe any other police officers giving narcotics, or what either you believed or they indicated was narcotics to informants, or anyone?
 
 
 66
 [POLLARD]: Not that I could recall at this time, sir. No.
 
 
 67
 [PROSECUTION]: You have no memory of ever seeing any police officer give narcotics?
 
 
 68
 [POLLARD]: That's correct.
 
 
 69
 * * *
 
 
 70
 * * *
 
 
 71
 [PROSECUTION]: Did you ever see [petitioner] give dope to informants?
 
 
 72
 [POLLARD]: Once again, Mr. [Prosecutor], no, never.
 
 
 73
 [PROSECUTION]: Did you ever see Rudy Davis give dope to informants?
 
 
 74
 [POLLARD]: Never.
 
 
 75
 [PROSECUTION]: Did he ever instruct you to give dope to informants?
 
 
 76
 [POLLARD]: Of course not.
 
 
 77
 [PROSECUTION]: Did he ever instruct any other officer to give dope to informants?
 
 
 78
 [POLLARD]: Not that I was ever able to perceive, no.
 
 
 79
 [PROSECUTION]: Did you ever observe your partner Henry Meadows give dope to an informant at the directions of Rudy Davis?
 
 
 80
 [POLLARD]: No.
 
 
 81
 [PROSECUTION]: Did you ever previously testify that that was the case?
 
 
 82
 [POLLARD]: Not that I can recall my testimony. No.
 
 
 83
 Generally, a criminal defendant cannot prevent a witness from validly invoking the fifth amendment, even if that witness' testimony is crucial to the defense. United States v. LaRiche, 549 F.2d 1088 (6th Cir.), cert. denied, 430 U.S. 987 (1977). It is therefore error for a prosecutor to intimidate a defense witness into pleading the fifth amendment. See State v. Brown, 543 S.W.2d 56 (Mo. App. 1976) (prosecutor informed witness that he was considering a warrant against him); Commonwealth v. Jemmings, 225 Pa. Super. 489, 311 A.2d 720 (1973) (prosecutor told court about an unexecuted warrant against witness but claimed he would not prosecute if witness did not testify). As long as the court does not intimidate a witness, however, it may properly inform him of his right to remain silent if he testifies concerning his own potentially criminal conduct. United States ex rel. Robinson v. Zelker, 468 F.2d 159 (2d Cir. 1972), cert. denied, 411 U.S. 139 (1973). Here it should be noted that there was no contemporaneous objection made by defendants when the prosecutor asked that the witness be reminded about self-incrimination. He did testify in essentially a favorable manner to defendant's contentions at trial.
 
 
 84
 In the instant case, although the prosecution invited the court to remind Pollard about his rights while he was present, the court took great pains to explain the situation to the witness. He should have addressed this concern to the court outside the witness' presence. The intimidation element is lacking in this case. No objection, however, was made by petitioner's counsel to the prosecutor's comments, and the issue now raised on appeal was not addressed to the trial court. In any event, in order for the prosecution's action to constitute reversible error, the defendant must show that the testimony suppressed would have been material and favorable to the defense. United States v. Valenzuela-Bernal, 458 U.S. 858, 867-71 (1982); United States v. Teague, 737 F.2d 378 (4th Cir. 1984).
 
 
 85
 Defense counsel was attempting to show through Pollard's testimony that it was accepted police practice to give narcotics to informants in exchange for information. Pollard testified that he had done so, but that he had seen no other officer do so. It would have been inadmissible hearsay for him to have testified that he had heard that other officers did this. He specifically claimed never to have seen petitioner give narcotics to informants. No testimony useful to defen ant was suppressed by the prosecutor's statement to the court about Pollard's fifth amendment rights.
 
 D. SELECTIVE GRANT OF IMMUNITY
 
 86
 Under United States v. Gullett, 713 F.2d 1203, 1210 (6th Cir. 1983), cert. denied, 104 S. Ct. 973 (1984), it is not improper for the prosecution to exercise its discretion in granting or withholding immunity unless it violates defendant's due process rights. In some situations, however, the grant of immunity to prosecution witnesses and the denial of immunity to defense witnesses may violate due process. See United States v. Herman, 589 F.2d 1191, 1204 (3d Cir. 1978) (defense must show that the government's decisions on granting or denying immunity were made to deliberately distort the judicial factfinding process); United States v. Morrison, 535 F.2d 223, 229 (3d Cir. 1976) (due process violation to deny immunity when prosecutorial misconduct causes defendant's principal witness to withhold testimony); Earl v. United States, 361 F.2d 531, 534 n.1 (D.C. Cir. 1966) (dicta), cert. denied, 388 U.S. 921 (1967).
 
 
 87
 None of the exacerbating circumstances other courts have found necessary for a due process violation are present in the instant case. As already discussed, Pollard testified to all of the defense counsel's questions even without a grant of immunity and only invoked the fifth amendment during the prosecution's cross-examination.
 
 
 88
 One witness, James Martin, whom the prosecution called, pleaded the fifth amendment to every question asked of him except his name. Petitioner's counsel requested the court grant him immunity, which, of course, it did not have authority to do. See, e.g., United States v. Gullett, 713 F.2d at 1209. Petitioner claimed his testimony would have been relevant to the credibility of Roy McNeal, an unindicted co-conspirator. Petitioner, however, fails to explain and did not make an offer of proof concerning the substance of Martin's testimony. A mere allegation that the testimony would be helpful is insufficient justification for requiring a grant of immunity. See Government of the Virgin Islands v. Smith, 615 F.2d 964, 972-73 (3d Cir. 1980).
 
 
 89
 Petitioner has failed in carrying the difficult burden showing that the prosecution's selective use of immunity violated petitioner's due process rights.
 
 E. WITHHOLDING OF EXCULPATORY EVIDENCE
 
 90
 Petitioner claims that the prosecution deliberately withheld useful information from defendants. We find this claim to be meritless.
 
 
 91
 Petitioner further complaints that the prosecution failed to provide copies of a highly damaging statement made by Harold Chapman. The prosecution, however, did provide the statement to defense counsel. As the district court aptly pointed out, when huge amounts of discovery are involved in a case, some information is frequently inadvertently overlooked or omitted. No reversible error was demonstrated in respect to this contention.
 
 F. UNJUSTIFIABLE CASH PAYMENTS
 
 92
 The amount of money paid to certain prosecution witnesses was made known to the jury, and it is within the jury's province to make its credibility determinations based on this information. United States v. Grimes, 438 F.2d 391, 396 (6th Cir. 1971), cert. denied, 402 U.S. 989 (1971). These witnesses were paid regardless of the content of their testimony. Williamson v. United States, 311 F.2d 441 (5th Cir. 1963), cert. denied, 381 U.S. 950 (1965), in which witnesses were paid on contingency for evidence against certain targets therefore is not controlling here. This final claim of error is also deemed meritless.
 
 
 93
 A careful review of the record makes it clear that petitioner did not prove any constitutional violation meriting issuance of a writ of habeas corpus. We, therefore, AFFIRM the district court's denial of the petition.
 
 
 
 *
 HONORABLE TIMOTHY S. HOGAN, United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 In pertinent part, the trial judge instructed the jury on the conspiracy to deliver narcotics charge (count I), as follows:
 A police officer is not licensed by his employment to give narcotics to any person for human consumption. To do so is, itself, illegal. However, you must understand that neither Robert Mitchell [petitioner] nor Rudy Davis nor any other Defendant is here charged with the actual unlawful delivery of narcotics. Defendants are, instead, charged only with entering into an unlawful agreement to deliver narcotics. Whether or not an agreement to deliver narcotics is itself, a crime, depends on the state of mind of the person agreeing to so deliver the narcotics. If the person honestly believes it is lawful for him to do so, even if he is wrong, the mere agreement to do so is not a crime. On the other hand, if one honestly believes or knows that it is illegal to so deliver narcotics, even if he has a very noble and good reason for doing so, it would be unlawful to enter into an agreement to so violate the law.
 You are instructed, therefore, that the mere giving of narcotics by a Defendant to another, however illegal the act itself might be, would not itself prove guilt in Count I. And this is so even if the recipient who agreed to receive the narcotics was [sic] a named co-conspirator. For such testimony to prove guilt, you would first have to be satisfied beyond a reasonable doubt that both parties entered into the agreement in order to further the purpose of the conspiracy charged here. And, secondly, that the Defendant seriously entered into the agreement and that he did so knowingly or honestly believing that it would be illegal for him to so deliver narcotics. Again, what is important is what one actually believes the law is rather than what one might believe the law should be.
 
 
 [2]
 State law may, however, present a federal question when the constitutionality of state law is challenged. See Francis v. Franklin, 105 S. Ct. 1965, 1972 (1985) (striking down a jury instruction approved by the Georgia Supreme Court that permitted the burden of persuasion on the element of intent to shift to the criminal defendant 'once the State had proved the predicate acts')
 
 
 [3]
 The court immediately stopped this line of questioning and noted 'no prejudice [had] been effectuated.'
 
 
 [4]
 The prosecution's question to Battle was in response to the defenses' allegation that the prosecution was rewarding favorable testimony and punishing adverse testimony. A long colloquy ensued, at the end of which the court sustained defense counsel's objection to the question
 
 
 [5]
 Pollard no longer was a police officer at the time of the trial