PEOPLE v IACONNELLI

PEOPLE v BIVINS

PEOPLE v HAROLD DAVIS

PEOPLE v HAROLD TURNER

PEOPLE v MITCHELL

PEOPLE v HEROLD

PEOPLE v RUDY DAVIS

PEOPLE v HASLIP

Docket Nos. 27139-27141, 27151, 27191, 27192, 30663. Submitted June 22, 1981, at Detroit.—Decided February 2, 1982. Leave to appeal applied for.

REFERENCES FOR POINTS IN HEADNOTES

[1, 14] 21 Am Jur 2d, Criminal Law §§ 210, 212, 221, 222.
Prosecutor's power to grant prosecution witness immunity from prosecution. 4 ALR4th 1221.

[2, 5] 63 Am Jur 2d, Prosecuting Attorneys § 27.

[2] 75 Am Jur 2d, Trial §§ 193, 194, 261.
Propriety and effect of prosecuting attorney's argument to jury indicating his belief or knowledge as to guilt of accused—modern cases. 88 ALR3d 449.

[3] 75 Am Jur 2d, Trial §§ 237, 239.
Violation of federal constitutional rule (Griffin v California) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.

[4] 81 Am Jur 2d, Witnesses § 471.

[5] 75 Am Jur 2d, Trial §§ 31, 192.

[6] 41 Am Jur 2d, Indictments and Informations § 60.

[7] 81 Am Jur 2d, Witnesses § 2.

[8] 5 Am Jur 2d, Appeal and Error § 159.
75 Am Jur 2d, Trial §§ 17, 18.

[9] 75 Am Jur 2d, Trial § 21.

[10] 81 Am Jur 2d, Witnesses § 509.

[11] 5 Am Jur 2d, Appeal and Error §§ 838, 883.

[12] 16 Am Jur 2d, Conspiracy § 45.

[13] 75 Am Jur 2d, Trial § 751.

[15] 16 Am Jur 2d, Conspiracy § 34.
Right of accused to bill of particulars. 5 ALR2d 444.

[16] 16 Am Jur 2d, Conspiracy §§ 10, 42, 68.

Guido Iaconnelli, Morris Bivins, Harold Davis, Harold Turner, Robert Mitchell, Richard Herold, Rudy Davis, Erskine Haslip, and others were charged with conspiracies arising out of certain drug trafficking involving police corruption. The charges were contained in a two-count indictment. Count I charged all above-named defendants except Haslip with conspiracy to sell, manufacture, deliver, or possess with intent to deliver, narcotic drugs to one another and various other persons. Count II charged the above-named defendants except Iaconnelli and Harold Davis with conspiracy to obstruct justice by wilfully and unlawfully bribing, assaulting, kidnappping, attempting to murder, murdering, dissuading and hindering the arrest of certain persons for narcotics violations, and various other crimes. Bivins moved for a directed verdict on Count II at the close of the prosecution's case, which motion was granted. Following trial, verdicts convicting the above-named defendants were returned as follows: Robert Mitchell, guilty on both counts; Richard Herold, not guilty on Count I, guilty on Count II; Rudy Davis, not guilty on Count I, guilty on Count II; Morris Bivins, guilty on Count I; Erskine Haslip, guilty on Count II; Guido Iaconnelli, guilty on Count I; Harold Turner, guilty on Count I, not guilty on Count II; and Harold Davis, guilty on Count I, Detroit Recorder's Court, Justin C. Ravitz, J. The defendants appeal. The appeals were consolidated. *Held:*

1. The conviction of Richard Herold is reversed. Herold was represented by an attorney who also represented a codefendant against whom the case was dismissed in exchange for his testimony for the prosecution and who was later questioned relative to trial strategy of the defense by the prosecution. The timing and motive of the prosecution in inducing the witness justifies a finding of an intrusion into Herold's attorney-client relationship. In addition, the witness testified regarding incriminating conversations which he had had with Herold prior to trial. The combination of improper motive on the part of the prosecution and this tainted evidence requires reversal.

2. The invasion of Herold's right to counsel does not extend to the other defendants, the invasion being only indirect.

3. *The defendants' numerous claims of prosecutorial miscon-*

[17] 29 Am Jur 2d, Evidence § 125.
   30 Am Jur 2d, Evidence §§ 1170-1172.
[18] 5 Am Jur 2d, Appeal and Error § 744.
[19] 29 Am Jur 2d, Evidence § 327.
   81 Am Jur 2d, Witnesses §§ 569, 571.
[20] 16 Am Jur 2d, Conspiracy §§ 14, 20.

duct, while supported by the record in some instances, involved conduct which was not so serious as to mandate reversal. Its impact on the trial as a whole was slight and little if any prejudice was shown. The cumulative effect of the alleged misconduct was not such as to deny the defendants a fair trial.

4. The trial court's rulings concerning another codefendant-witness were proper. The defendants failed to show that any of the rulings resulted in prejudice and thus constituted grounds for reversal.

5. The record reveals that the evidence presented against Rudy Davis was properly admitted and that the jury was properly instructed as to its use.

6. The trial court properly instructed the jury regarding Robert Mitchell's defense that he was exempted by statute from liability for delivery of narcotics because it was done in the lawful performance of his duties. Mitchell is not entitled to a new trial.

7. The record reveals that neither the prosecution nor the trial court abused their discretion in denying the defendants' requests to obtain and grant immunity for certain defense witnesses. The defendants failed to show that sufficient justification for the requested grants existed or that they suffered prejudice from the denials.

8. The trial court erred in denying the defendants' request for a bill of particulars. However, reversal is not required, no prejudice having been shown.

9. Harold Davis's conviction is reversed. The record fails to reveal that Harold Davis agreed in fact to support and promote the central, Count I, conspiracy. The record does reveal, however, that a fair inference could be made, based on the evidence presented, that Bivins, Iaconnelli, and Turner did support and promote the central conspiracy.

10. The trial court properly denied Erskine Haslip's motions for a directed verdict, a judgment notwithstanding the verdict, or a new trial. The evidence presented to support the charge against him was for the trier of fact to weigh.

11. The trial court properly admitted evidence of Harold Davis's prior convictions.

12. Harold Turner is not entitled to a new trial because of the admission of evidence of statements of other conspirators. The record reveals that the trial court's instructions protected the defendant and that any error in the instructions was harmless.

13. The trial court properly instructed the jury relative to

Harold Turner's liability for the actions of his conspirators prior to his joining the conspiracy.

14. The convictions of the remaining defendants are affirmed. Affirmed in part and reversed in part.

1. PROSECUTING ATTORNEYS — IMMUNITY FROM PROSECUTION — INTRUSION INTO ATTORNEY-CLIENT RELATIONSHIP.

The prosecution in a criminal case may attempt to induce one or more of multiple defendants to testify against his codefendants with offers of immunity from prosecution; however, where the motive of the prosecution or the timing of the prosecution's efforts to so induce justifies the conclusion that there was a direct intrusion into the attorney-client relationship of the codefendants, reversal will depend on whether the intrusion resulted in the admission of tainted evidence, whether there was a communication of the codefendants' trial strategy to the prosecution, and whether the intrusion was deliberate.

2. PROSECUTING ATTORNEYS — IMPROPER ARGUMENT.

A prosecutor may not attempt to place the prestige of his office or that of the police behind a contention that a defendant is guilty, nor to vouch for the credibility of a witness; a reviewing court, in determining the propriety of a prosecutor's comments, should consider the prominence of the office held by the prosecutor, the subsequent weight accorded his statements, and any impact on the trial as a whole.

3. PROSECUTING ATTORNEYS — CONSTITUTIONAL LAW — RIGHT TO REMAIN SILENT — IMPROPER ARGUMENT.

A prosecutor may not comment on a defendant's failure to testify because the comment infringes on the defendant's right to remain silent; however, reversal is not required where any prejudice resulting from the comment may be cured by an appropriate instruction to the jury and the defendant fails to request such an instruction.

4. PROSECUTING ATTORNEYS — WITNESSES — EXAMINATION OF WITNESSES.

A prosecutor may cross-examine a defendant or defense witnesses regarding subject matter raised by the defendant on direct examination.

5. PROSECUTING ATTORNEYS — PROSECUTORIAL MISCONDUCT — FAIR TRIAL.

A criminal defendant may be determined to have been denied a

fair trial because of prosecutorial misconduct only where the misconduct rises to the level of a deliberate and concerted effort to prevent the defendant from receiving a fair trial.

6. WITNESSES — CRIMINAL LAW — LATE INDORSEMENT OF WITNESSES.

A trial court may authorize the late indorsement of witnesses by a prosecutor, but a continuance should be granted so as to obviate any prejudice to the defendant arising from surprise or lack of time to prepare for cross-examination.

7. PROSECUTING ATTORNEYS — ACCOMPLICES — DUTY TO CALL WITNESSES.

A prosecutor's duty to call all known res gestae witnesses does not extend to accomplices; once voluntarily indorsed, an accomplice may be struck as a witness upon motion of the prosecution, but the witness must be kept available for examination by the defense.

8. CRIMINAL LAW — TRIAL — JOINDER — APPEAL.

Multiple criminal defendants, jointly charged with an offense, may be tried jointly or separately in the discretion of the trial court, and on appeal the decision of the trial court will be affirmed absent an affirmative showing of prejudice to substantial rights of the defendants.

9. CRIMINAL LAW — TRIAL — JOINDER — SEVERANCE.

A criminal defendant is entitled to a trial separate from a codefendant where it appears that the defenses of each are antagonistic.

10. WITNESSES — INTERROGATION OF WITNESSES — LEADING QUESTIONS.

A trial court reasonably must control the mode and order of interrogating witnesses so as to make the interrogation effective for the ascertainment of truth, avoid wasted time, and protect witnesses from harassment and undue embarrassment; a witness may be cross-examined regarding any matter relevant to a case, and leading questions may be permitted where necessary to develop the testimony of witnesses (MRE 611).

11. CRIMINAL LAW — JURY VERDICTS — APPEAL.

The Court of Appeals will not disturb a defendant's conviction by a jury on the basis of alleged insufficiency of the evidence where the record reveals that sufficient evidence was presented to enable the jury to believe that the defendant was guilty beyond a reasonable doubt.

12. EVIDENCE — CONSPIRACY — SIMILAR ACTS.

Evidence concerning a criminal defendant charged with conspiracy relative to transactions involving the defendant and others who are neither codefendants nor alleged conspirators may be admitted to prove the defendant's intent and as being probative of a general plan or scheme (MRE 404[b]).

13. CONSPIRACY — JURY INSTRUCTIONS — POLICE OFFICERS.

An instruction to a jury that a police officer who acts in a manner which he in good faith believes to be lawful but which in fact is illegal cannot be found guilty of entering into a conspiracy to do an unlawful act is proper; the officer is not exempt from liability for an illegal act in the performance of his duties, and the determination of whether the officer had such good-faith belief is for the jury (MCL 335.356[3]; MSA 18.1070[56][3]).

14. PROSECUTING ATTORNEYS — IMMUNITY FROM PROSECUTION — DEFENSE REQUESTS FOR GRANTS OF IMMUNITY.

Discretion to request a court order granting immunity from prosecution rests exclusively with a prosecuting attorney, and the denial by a prosecutor or a court of a request for a defendant to petition or grant immunity for a defense witness will be found to be proper on appeal absent a showing that such a grant would have been justified and that the denial was a deliberate attempt to suppress the truth (MCL 780.701; MSA 28.1287[101]).

15. CONSPIRACY — SHORT-FORM INDICTMENT — BILL OF PARTICULARS.

A criminal defendant charged with conspiracy by the short-form information or indictment who makes a seasonable request has a mandatory right to a bill of particulars setting forth with some degree of specificity the acts by which the defendant is connected with or by which he is deemed to be a participant in the conspiracy; however, failure to grant such a request does not require reversal for a new trial where the requested information otherwise is provided and no prejudice is shown (MCL 767.44; MSA 28.984).

16. CONSPIRACY — EVIDENCE — CIRCUMSTANTIAL EVIDENCE.

Evidence from which it may be inferred that a defendant agreed to further, support, and promote a mass conspiracy through his participation in one or more of various individual conspiracies which contributed to the mass conspiracy will support the defendant's conviction on an indictment for the mass conspiracy; direct proof or establishment of a formal agreement to

conspire is not necessary, but the evidence must warrant a fair inference that an agreement existed and that the defendant was a party to that agreement.

17. EVIDENCE — SUFFICIENCY OF EVIDENCE.

Evidence will be determined to be sufficient to support a conviction where, taken in the light most favorable to the prosecution, a rational trier of fact would be justified in finding beyond a reasonable doubt that all the elements of the crime were present.

18. APPEAL — LAW OF THE CASE.

A legal issue raised and determined on appeal is the law of the case and may not be raised in a subsequent appeal after remand; however, where the issue is not the precise question previously disposed of, it may be raised in the subsequent appeal.

19. CRIMINAL LAW — IMPEACHMENT — EVIDENCE — PRIOR CONVICTIONS.

A trial court, in determining whether to admit evidence of a defendant's prior convictions for impeachment purposes, must consider the nature of the prior offense, whether it was substantially for the same conduct for which the defendant is being tried, and any effect on the decisional process should the defendant choose not to testify out of fear of impeachment.

20. CONSPIRACY — PRIOR ACTS OF CONSPIRATORS.

A person who joins a conspiracy after it has been formed is bound by all acts of the other conspirators committed prior to his joining in furtherance of the conspiracy even where he does not know all of the conspirators and does not participate in all of the objects of the conspiracy.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Robert J. Sheiko,* Assistant Prosecuting Attorney, for the people.

*John C. Mouradian,* for defendants Iaconnelli and Bivins.

*James H. Grant,* for defendant Harold Davis.

*Ramsdell, Oade & Feldman,* for defendants Turner and Mitchell.

*Norman L. Lippitt,* for defendant Herold.

*Robert S. Harrison,* for defendant Rudy Davis.

*Lawrence W. Rattner,* for defendant Haslip.

Before: J. H. GILLIS, P.J., and BASHARA and K. N. SANBORN,* JJ.

J. H. GILLIS, P.J. Defendants appeal by right from their jury convictions in Detroit Recorder's Court on December 20, 1975.

Defendants Robert Mitchell, Richard Herold, Rudy Davis, Morris Bivins, Erskine Haslip, Guido Iaconnelli, Harold Turner and Harold Davis were charged in a two-count indictment.

The first count charged all but Haslip with conspiracy to sell, manufacture, deliver, or possess with intent to deliver narcotic drugs to one another and various other persons pursuant to MCL 750.157a; MSA 28.354(1), 1952 PA 266, § 2 (relating to illegitimate traffic in drugs), and 1971 PA 196 (the Controlled Substances Act of 1971, which superseded 1952 PA 266 during the course of the alleged conspiracy and which was repealed by 1978 PA 368).

The second count charged all of the above-named defendants except Guido Iaconnelli and Harold Davis with conspiracy to obstruct justice by wilfully and unlawfully bribing, assaulting, kidnapping, attempting to murder, murdering, dissuading and hindering the arrest of persons for narcotics violations, and various other crimes pursuant to MCL 750.157a; MSA 28.354(1), MCL

---

* Circuit judge, sitting on the Court of Appeals by assignment.

750.505; MSA 28.773, 1952 PA 266, § 2, and 1971 PA 196.

In addition to the above-named defendants, eight others were named as codefendants. Robert Neely, Willie Peeples, Charlie Brown, Carlos Gonzales, and Richard Kendricks were charged in Count I, and codefendants William Stackhouse, Daniel O'Mara, Willie Peeples, Charlie Brown, David Slater, Carlos Gonzales and Richard Kendricks were charged in Count II.

In Count I, the following persons were named as coconspirators but not as defendants: Erskine Haslip, James Moody, Chester Campbell, George Hall, George Dudley, Ward Washington, Herbert Pittman, and George Reed. In Count II, the following persons were named as coconspirators but not as defendants: George Dudley, Milton Battle, Wiley Reed, Roy McNeal, Haywood LeRoy Sampson, Olivia Sampson, Peaches Miles, Larry McNeal, Anna Marie McNeal, Alice Bailey, Chester Lee McNeal, and Harold Jackson.

The conspiracies were alleged to have taken place over a five-year period from January 1, 1968, to January 1, 1973, and were alleged to have taken place in Detroit and at various specific addresses in Farmington, Michigan, and in the cities of New York, Chicago, Illinois; Minneapolis, Minnesota; Nashville, Tennessee; Birmingham, Alabama; Miami, Florida; Philadelphia, Pennsylvania; Windsor, Ontario, Canada, and various other locations.

In anticipation of a trial that would last several months, a jury of 20 persons was sworn on June 30, 1975, and the trial proceeded. All of the above-named defendants were tried jointly by the jury except defendant Kendricks, who was tried in the same proceeding in a nonjury trial.

On December 20, 1975, the jury returned verdicts as to those defendants who are the subjects of this consolidated appeal as follows: Robert Mitchell, guilty on both counts; Richard Herold, not guilty on Count I, but guilty on Count II; Rudy Davis, not guilty on Count I, but guilty on Count II; Morris Bivins, guilty on Count I (Count II was dismissed by the trial court at the close of the prosecution's case by grant of Bivins' motion for directed verdict); Erskine Haslip, guilty on Count II (not charged on Count I); Guido Iaconnelli, guilty on Count I (not charged on Count II); Harold Turner, guilty on Count I, but not guilty on Count II; Harold Davis, guilty on Count I (not charged on Count II). The other defendants were acquitted.

The trial judge imposed the following sentences: Rudy Davis, from 3 years and 4 months to 5 years in prison plus a $10,000 fine; Robert Mitchell, from 13 years and 4 months to 20 years plus a $10,000 fine on Count I and from 3 years and 4 months to 5 years plus a $10,000 fine on Count II; Richard Herold, from 3 years and 4 months to 5 years plus a $10,000 fine; Morris Bivins, from 13 years and 4 months to 20 years plus a $5,000 fine and $10,000 costs; Erskine Haslip, from 2 to 5 years plus a fine of $2,500 and costs of $5,000; Guido Iaconnelli, from 13 years and 4 months to 20 years in prison plus a $5,000 fine and $10,000 in court costs; Harold Turner, from 8 to 20 years in prison plus $10,000 in court costs; Harold Davis, from 10 to 20 years in prison plus a $5,000 fine and costs to be determined.

Defendants appeal as of right.

It was the people's theory of the case that under Count I, the civilian defendants (as opposed to those defendants who were police officers) con-

spired to traffic in narcotics, participating in the conspiracy as dealers, deliverers, operators of narcotics establishments, and operators of legitimate businesses, using their businesses to pass through money made in the narcotics business and various other items, while those defendants who were police officers counselled, aided, and planned the setting up of narcotics establishments, aided the civilian traffickers by tipping them off when raids were to take place (in return for money), by working with those traffickers to raid rival narcotics operators to secure money and narcotics and subsequently recycling the narcotics so obtained through friendly operators, and by taking money to allow friendly operators to remain unmolested while raiding their competition. The people theorized that favored drug operations in Detroit's 10th precinct operated under ground rules set by the corrupt police, such as not to sell to children and only to operate during certain hours.

The people's theory under Count II was that the defendants conspired to obstruct justice through the commission of numerous crimes in support of the conspiracy to traffic in narcotics, as alleged in Count i.

The people further alleged that the object of the conspiracies was to share in the "huge profits" derived from the narcotics business within Detroit's 10th precinct.

It was the theory of the defendant police officers (including appellants Rudy Davis, Robert Mitchell, and Richard Herold) that they were scapegoats and victims of a scheme by the prosecution and high-level police officials who sought to indict and convict the defendants because of political ambition and in order to show success against the extensive illegal drug trafficking in Detroit. It was

the defendant police officers' contention that they in fact were operating in the course of their duties during the alleged conspiracy and that the case against them was fabricated by the prosecution and officials in the police department.

It was the theory of defendants Bivins, Haslip, and Turner that the testimony against them was fabricated and that the witnesses against them were inherently unreliable. Defendant Iaconnelli contended that he had never participated in the narcotics business and was not involved in any illegal activity. He admitted to having met Milton Battle, and that he knew him socially, but claimed that he was never aware of Battle's illegal activity.

The indictment was amended during the course of the trial, and the amended indictment was read as part of the jury charge after the close of proofs. Willie Peeples, Carlos Gonzales, and Charlie Brown were dropped from Count I of the indictment, and a total of 27 persons were named as unindicted coconspirators in Count I. The dates of the conspiracy charged in Count I were amended to cover a period of from November 1, 1969, to January 1, 1973, and Windsor, Ontario, was dropped as an alleged location of the Count I conspiracy. Morris Bivins and Richard Kendricks were dropped from Count II of the indictment. The dates of the conspiracy alleged in Count II were amended to cover a period of from January 1, 1970, to January 1, 1973, and the location of the Count II conspiracy was ultimately limited to the City of Detroit.

I

On appeal, all defendants claim that they are entitled to a new trial because the prosecution engaged in a deliberate course of misconduct de-

signed to convict them regardless of their guilt. The prosecution responds to this claim by alleging that defendants, knowing that they were guilty, had no other viable defense and so attempted to "build" a case of prosecutorial misconduct into the trial by raising as many objections as possible on that ground, even though such objections were meritless.

This issue, in the context of a lengthy trial, presents a difficult task for the appellate reviewer, but we have examined the alleged misconduct carefully. Most of the alleged misconduct was not improper when viewed in context, with proper regard for the circumstances. Some conduct which may be suspect is not shown conclusively to be improper, and other alleged improper conduct is not serious enough to warrant the conclusion that the defendants were denied a fair trial, except for the claim of defendant Richard Herold that his Sixth Amendment right to counsel was invaded impermissibly.

(1) Anthony Lopez was a police officer who was named as a defendant in the original indictment. The case against him was dismissed in exchange for his testimony under a grant of immunity. Lopez was represented by the same counsel as defendant Herold during the preliminary examination in the instant case.

While there is no evidence in the record to show that trial strategy actually was communicated to the prosecution by Lopez, the record reveals that Lopez was questioned regarding such matters prior to becoming a prosecution witness.

Defendants now claim that the prosecution's

successful effort to lure a witness from among the defendants is an impermissible invasion of defendants' Sixth Amendment right to counsel, relying chiefly on the case of *United States v Morrison,* 602 F2d 529 (CA 3, 1979). The people counter by asserting the correctness of the trial court's ruling on the subject and by further asserting that Lopez is the only one with standing to complain of the alleged intrusion.

The instant case is unusual because multiple defendants are involved, and neither party's cited authority is precisely applicable. The prosecution apparently succeeded in doing indirectly what it was forbidden to do directly. If Lopez had been an undercover "plant", spying on the defense, *Morrison* and *Weatherford v Bursey,* 429 US 545; 97 S Ct 837; 51 L Ed 2d 30 (1977), would mandate reversal.

Those cases deal with two different "invasions" of the attorney-client relationship: one where an undercover agent attended an attorney-client meeting as a codefendant, and the other where two drug enforcement agents visited a defendant without counsel's permission and attempted to persuade her to work with them as an informer and to retain a public defender instead of her then-current attorney.

The people's argument and the trial court's ruling are stated as if the deliberate planting of a spy among the defense is the only possible Sixth Amendment violation which would arise from the instant facts. *Morrison* shows this to be untrue.

Although the facts in the cited cases are different from those of the instant case, there are

principles which the defense urges were violated. The gist of the defendants' contention is that the prosecution made a deliberate effort to uncover trial strategy, thus intruding on the attorney-client relationship.

The fact that the investigators in the instant case expressed interest in notes taken by Lopez while he was still a codefendant and that they later questioned him about trial strategy shows that their motive was improper. See *Morrison, supra.* The difference which the trial court found dispositive is in the nature of the "intrusion". The people and the court seemed to conclude that there was no intrusion at all, since Lopez acted independently on his own behalf in gathering information while a codefendant.

There is nothing wrong with an effort to obtain the testimony of a codefendant against his accomplices by the offer of immunity, which is a common practice. In the instant case, however, the timing of the prosecution's efforts to induce Lopez to testify and the improper motive behind those efforts justifies the finding of an intrusion into the attorney-client relationship of Lopez's codefendants (particularly those who were also represented by Mr. Lippitt, Lopez's attorney).

*Weatherford* acknowledges that such intrusions are not per se error requiring reversal. In deciding whether to reverse, factors to be considered are whether the intrusion results in the admission of tainted evidence, whether there was a communication of trial strategy to the prosecution, and whether the intrusion was deliberate. Although the record does not show that any trial strategy was communicated (testimony showed that Lopez

was asked about trial strategy but did not show how he responded), Lopez testified to incriminating conversations which he had with his codefendants during the preliminary examination and during a conference with their attorney. The combination of improper motive and the introduction of conversation "tainted" by being obtained by reason of the intrusion calls for reversal, at least as to defendant Herold, who was represented by the same attorney as Lopez.

(2) Defendants allege that the prosecution deliberately concealed the fact that a key prosecution witness was still using narcotics at the time she testified, although she claimed to have quit using drugs some six months earlier. Contrary to defendants' contention, the record does not show that the prosecution was aware of the fact. It appears that the prosecution cooperated in uncovering the information, and the information was dramatically put before the jury outside of the normal order of presentation of testimony to the benefit of defendants.

(3) Certain improper comments were made by the prosecution during the course of the trial, but we find them not to be so serious as to mandate reversal.

During opening argument, the prosecution told the jury that the evidence would show that Lieutenant George Bennett was chosen by Police Commissioner Nichols to head the investigation which led to the charges in the instant case. The prosecution told the jury that Bennett was selected because Commissioner Nichols felt that Bennett could "investigate thoroughly, honestly, with integrity".

The defense contends that by this remark the prosecution improperly vouched for the credibility of Bennett.

The people concede, perhaps too easily, that this remark was improper, but claim that since the defense failed to object and since the potential prejudice could have been cured by instruction, the error is waived and further that, since the defense improperly attacked the credibility of the witness, no prejudice could have resulted.

The allegedly improper statement was literally a remark that when Bennett was chosen to head the investigation the commissioner thought that Bennett was trustworthy enough to handle the task. Although the statement carries the unmistakable innuendo that the prosecution believed the witness to be highly credible, the statement is not the type of blatant comment on the guilt of a defendant that is condemned in *People v Erb,* 48 Mich App 622, 631-633; 211 NW2d 51 (1973), cited by the defense on this issue. Still, the remark is such as to be improper under that case, which holds that it is error for a prosecutor to attempt to place the prestige of his office or that of the police behind the contention that a defendant is guilty.

*Erb* holds it improper for a prosecutor to vouch for the credibility of a witness and notes that factors to be considered in determining the impropriety of comments are the prominence of the office held by the prosecutor and the subsequent weight of statements made by him.

In the instant case, the prominence of the office is doubly significant because the remark was made by the prosecuting attorney, but its substance was

attributed to the police commissioner. On the other hand, the weight of the statement is relatively slight, in contrast to the remark in *Erb* where the prosecutor told the jury that he would never present a witness who would testify under oath to a falsity of any kind.

Under *Erb,* the remark here complained of, while improper, was not so serious as to mandate reversal of itself. Furthermore, we consider its impact on the trial as a whole to be slight due to the length and complexity of the trial. While the remark was deliberate, it is not the type of statement which seems "calculated to deny defendants a fair trial".

During closing argument, the prosecutor remarked:

"Once a defendant takes the stand, as the court has already said, he does not have to. And if he doesn't, I cannot comment upon it. But, if he does take the stand, he is like any other witness."

Defendants claim that this is another example of the prosecution's deliberate attempts to prejudice the jury. The people claim that the defense failed to object to the remark and that an adequate curative instruction was given.

A comment by a prosecutor on a defendant's failure to take the stand is error because it infringes on a defendant's right to remain silent. *People v Balog,* 56 Mich App 624; 224 NW2d 725 (1974), MCL 600.2159; MSA 27A.2159. This Court held in *Balog* that a remark similar in character to the one in the instant case was curable by instruction and thus did not constitute error requiring reversal. In *Balog,* the prosecutor said that

he did not mean to give the impression that the defendants had to testify and further told the jury at least twice that the defendants did not have to testify. *Balog* purports to distinguish other cases involving the same problem because the remark made there was not "the kind that clearly and irreparably undermine the defendants' rights * * *". *Id.,* 629.

The prosecutor's remark that he could make no comment on defendants' failure to take the stand was, in itself, an impermissible comment. However, it is perhaps the most innocuous type of reference possible, and, under *Balog,* it is not grounds for reversal.

(4) There is no merit to defendant Herold's claim that he was denied a fair trial by improper "smear" tactics on cross-examination. The allegedly improper subject matter was originally introduced by defendant Herold. The questions, for the most part, were not objected to during trial, and adequate curative instructions were given when necessary.

Where subject matter is introduced by a defendant in his direct testimony, further inquiry is proper on cross-examination. *People v Thomas Jones,* 73 Mich App 107; 251 NW2d 264 (1976).

(5) Defendants allege numerous other instances of prosecutorial misconduct which we find either not to be supported by the record or not to have been serious enough to have significantly prejudiced the defendants. We find it inappropriate to deal with all of the allegations in detail, but we note that evidence of the allegedly unjustified cash payments by police to prosecution witnesses was put before the jury. See *United States v Shelton,* 588 F2d 1242 (CA 9, 1978).

(6) In summary of our disposition of the question

of prosecutorial misconduct, we find that defendant Herold is entitled to a new trial because the prosecution effectively violated his Sixth Amendment right to counsel by questioning a codefendant (who at one point shared the same attorney with defendant Herold) regarding defense strategy. While there was no error in presenting the codefendant as a witness for the prosecution once he had pled guilty and agreed to testify, a prosecution witness admitted questioning the codefendant concerning defense strategy. By analogy to the cases of *Morrison* and *Weatherford,* such an intrusion should not be allowed.

None of the other defendants are entitled to reversal on grounds of prosecutorial misconduct. As a matter of policy, we think that the invasion of Herold's right to counsel should not be held to extend to the other defendants. The invasion of Herold's right is direct, while invasion of the others' rights to counsel rests to some extent on an inference that strategy was communicated among other defendants who were not represented by the same attorney. Such circumstance might be viewed as lessening the expectation of privacy.

While a number of the other allegedly improper incidents could support a finding of some deliberate prosecutorial misconduct, little if any prejudice has been shown to have resulted. None of the examples of alleged misconduct are as blatant and serious as the errors which prior case law finds to be necessary to constitute the denial of a fair trial. See *Berger v United States,* 295 US 78; 55 S Ct 629; 79 L Ed 1314 (1935), and *People v Brocato,* 17 Mich App 277; 169 NW2d 483 (1969).

Case law views prosecutorial misconduct as a ground for finding that a defendant was denied a fair trial only where such misconduct rises to the

level of a deliberate and concerted effort to prevent the defendant from receiving a fair trial. Defendants cite *Brocato,* where the prosecutor made knowing, improper reference to such forbidden topics as polygraph tests and guilty pleas by others arrested in connection with the crime. The Court in *Brocato,* found that the prosecutor flagrantly violated the rulings of the lower court, improperly argued with and embarrased witnesses, testified in the guise of cross-examination, and introduced and referred to hearsay testimony. The abuses demonstrated in the instant case (as opposed to those alleged) do not rise to a level of misconduct which would deny defendants their right to a fair trial.

The instant case is more comparable to *People v Missouri,* 100 Mich App 310, 325-330; 299 NW2d 346 (1980). This Court, in *Missouri,* found that various claims of error on the part of the prosecution did not, either singly or in combination, deny the defendants a fair trial. The same is true in the case at bar.

Regarding the cumulative effect of individual errors, we find any such effect not to be serious enough to mandate a new trial.

The trial in the instant case was "hotly contested", even more so than most criminal cases. This is because the main thrust of the defense was in part a contention that the prosecution itself deliberately and knowingly was attempting to "frame" the defendants in furtherance of political ambitions. *People v Allen,* 351 Mich 535; 88 NW2d 433 (1958), deals with a situation where "intemperate" remarks by the prosecution were found excusable in light of the defense arguments inpugning the honesty of the prosecution and its witnesses. The same rationale applies in the instant case in

relation to a number of allegedly improper questions and remarks made by the prosecution. Perhaps the most serious remarks along these lines are the prosecution's mention during closing argument that it could not comment on the fact that certain defendants decided not to testify and a series of remarks on the subject of the cost of the trial in terms of the cost to society of the crimes committed and their aftermath.

Considering the length and complexity of this trial and the antagonism which inevitably arose between the defense and the prosecution, we do not find that defendants were denied a fair trial by deliberate prosecutorial misconduct.

## II

Defendants claim that the trial court erred in its treatment of witness Milton Battle in several respects, but we find no error arising from the rulings complained of.

(1) The defendants claim that the trial court erred in ruling that Milton Battle could be indorsed as a prosecution witness.

Milton Battle was a central figure in the alleged conspiracies. He was originally a defendant, but he pled guilty on the 20th day of trial and was indorsed as a witness for the prosecution. As a result of this, the trial court granted a defense motion to dismiss the jury and grant a continuance to avoid any prejudice to the defense. The defense is unclear as to whether it specifically appeals the trial court's ruling indorsing Battle, but *People v Meadows,* 80 Mich App 680, 690; 263 NW2d 903 (1977), authorizes the late indorsement of witnesses where a continuance is granted which

obviates any prejudice arising from surprise or lack of time to prepare for cross-examination.

(2) The defendants claim that the trial court erred in ruling that Milton Battle could be dropped as a prosecution witness.

During the presentation of its case in chief, the prosecution moved to strike Milton Battle as a witness. All defense attorneys agreed to waive the prosecution's production of Milton Battle except counsel for defendants Rudy Davis and Turner.

The trial court granted the prosecution's motion to strike Battle as a witness, noting that Battle was an accomplice and therefore not required to be indorsed as a res gestae witness and also noting that he was available for the defense either to call as a witness or question, thus obviating any undue prejudice which would derive from the prosecution's failure to produce him. The trial court acknowledged its awareness that the defense had taken a posture which would be prejudiced in subtle ways by the prosecution's failure to call Battle but that such prejudice was not serious and that the proper decision was to grant the motion.

The trial court's ruling was correct, and defendants were not unduly prejudiced thereby. The prosecution is not obligated to present an accomplice as a res gestae witness. *People v White,* 401 Mich 482; 257 NW2d 912 (1977).

Defendants rely on *People v Mitchell,* 48 Mich App 361; 210 NW2d 509 (1973), *lv den* 391 Mich 752 (1973), *People v McPherson,* 84 Mich App 81; 269 NW2d 313 (1978), and *People v Lummis,* 260 Mich 170, 173; 244 NW 438 (1932), in claiming

that error requiring reversal occurred as a result of the ruling in question.

A reading of *Mitchell* reveals that the substantive basis for reversal in that case was the failure of the prosecutor to have the witness in question available. In *McPherson,* the trial court properly excused the production of an indorsed witness where the prosecution acted with due diligence in attempting to produce the witness. Language in *Lummis* recommends the procedure of having the prosecution call a voluntarily indorsed witness to the stand in performance of its duty to make the witness available, but the issue dealt with in that case was whether the defendant could cross-examine a witness indorsed but not called by the prosecution. *Lummis, supra,* 173, indicates that the prosecution's obligation is to have the witness in court and available for examination but that there is no obligation that he be called as a prosecution witness. By moving to strike Battle as an indorsed witness, and yet keeping him available to the defense, the prosecution arrived at the same substantive position that the Supreme Court required in *Lummis.* There, it was held that the prosecution could call and offer the witness for cross-examination but that the witness then became a defense witness (where the prosecution offered no direct examination). *Id.*

In *People v Bedford,* 78 Mich App 696; 260 NW2d 864 (1977), the prosecution was allowed to strike an indorsed witness who was an accomplice. The witness was struck after the commencement of trial, and this Court held that the defendants there could no longer rely on the prosecution to produce the witness. *Bedford* presents a more com-

pelling case for defendants than the one at bar, but there no error occurred which required reversal.

Finally, only defendants Rudy Davis and Harold Turner opposed the motion to strike. Defendant Rudy Davis actually called Battle as a witness, removing any possibility of prejudice as to Davis. All other defendants except Turner affirmatively waived the production of Battle as a prosecution witness. Turner himself could have called Battle as a witness or interviewed him to obtain information. Thus, there is no ground for reversal on the narrow issue of whether it was proper to grant the prosecution's motion to strike.

(3) The defendants claim that the trial court erred in denying their motions for severance (which motions were based on the alleged existence of antagonistic defenses).

Defendant Rudy Davis decided to call Milton Battle as a witness on his behalf after the prosecution's motion to strike was granted. Davis and all other defendants then moved for a severance based on the proposition that, by calling Battle, the defense of Rudy Davis became antagonistic to that of the others. The trial court denied these motions.

Where multiple defendants are charged jointly with an offense, they may be tried jointly or separately in the discretion of the trial court. *People v Hurst,* 396 Mich 1; 238 NW2d 6 (1976). The trial court's decision will be upheld absent an abuse of discretion, *People v Billingslea,* 70 Mich App 371; 246 NW2d 4 (1976), which requires an affirmative showing of prejudice to substantial

rights of the accused. *People v Carroll,* 396 Mich 408; 240 NW2d 722 (1976).

The classic ground for requiring severance is the case of antagonistic defenses, wherein of two codefendants each claims himself to be innocent by reason of the fact that the other is the guilty party. *Hurst, supra.*

The people note correctly that defendants cite no case of antagonistic defenses based on the testimony of one defendant's witness (as opposed to the defendant himself) implicating the other. The people reasonably concede, however, that such a situation falls within the principles of *Hurst* and the other antagonistic defenses cases.

Defendants' claim fails, however, on two points. First, this is not a case where the defenses are inconsistent, and therefore the defenses are not "antagonistic". See *Carroll, supra.* Although it is true that defendant Rudy Davis presented a witness whose testimony was exculpatory to him but inculpatory to others, the inculpatory portion of his testimony was not a part of Rudy Davis's defense. Second, it is apparent that if a severance had been granted the prosecution would have called Battle as a witness in the cases against all defendants except Rudy Davis, who would have called Battle as a witness on his own behalf, and thus the testimony against each party would be substantially the same. See *People v Scott,* 61 Mich App 91; 232 NW2d 315 (1975).

Under the circumstances, therefore, the trial court did not abuse its discretion.

(4) The defendants claim that the trial court

erred in its control of the cross-examination of witness Milton Battle.

There is no merit to defendants' claim that the trial court erred in refusing to restrict the scope of Battle's cross-examination to matters brought out on direct examination and by allowing the prosecution to alternatively lead and impeach the witness.

MRE 611 now governs the scope of cross-examination and the use of leading questions and is consistent with prior law, applicable at the time of trial. MCL 768.29; MSA 28.1052. It provides the trial court with discretion to control the presentation of evidence in order to ascertain the truth, avoid waste of time, and protect witnesses from undue embarrassment. It further provides that a witness may be cross-examined on any matter relevant to the case. MRE 611(b). See *Moore v Lederle Laboratories,* 392 Mich 289, 294; 220 NW2d 400 (1974).

It further allows the use of leading questions as necessary to develop the testimony of witnesses. MRE 611(c), MCL 768.24; MSA 28.1047, *People v Hunt,* 30 Mich App 94; 186 NW2d 34 (1971).

There is, therefore, specific authority for each of the actions which defendants claim constitute error on the part of the trial court in its treatment of Battle's testimony which requires reversal. Applying the rule to the unusual circumstances of the instant case reveals that the trial court did not abuse its discretion but in fact used that discretion flexibly to permit the ascertainment of the truth.

If the scope of Battle's cross-examination had

been limited to his direct testimony, the prosecution would have been prevented from presenting all of the facts which were, in its view, relevant to the transactions involved in the case. While it is true that the unrestricted cross-examination allowed the prosecution, in effect, to strengthen its case in chief during the presentation of the defense, such a procedural problem is not serious enough to mandate suppression of relevant evidence in a complex trial such as in this case. *People v McCrea,* 303 Mich 213, 249; 6 NW2d 489 (1942).

The trial court's solution to the problem of how to allow questioning of the witness (who was at times hostile to the prosecution) was that leading questions would be allowed but that the defense could object to "overly leading" questions. This represented a fair balance of the rights of the parties, given the conflicting position of the witness in relation to various defendants, and we do not consider it to have been an abuse of discretion.

In summary, the trial court prevented any prejudice resulting from allowing the late indorsement of Milton Battle as a witness by granting a continuance. The defense was not significantly prejudiced by the fact that the prosecution was later allowed to strike Battle as a witness, since he was available to all parties for questioning or to present as a witness. Antagonistic defenses were not created by the fact that Battle testified for one defendant and against other defendants because his testimony against the others was not necessary to the defense of Rudy Davis. The trial court properly exercised its discretion in controlling the testimony of witness Battle in order to ascertain fairly the truth as authorized by MRE 611. Defen-

dants' convictions should not be reversed on the basis of the trial court's rulings regarding the testimony and status of witness Milton Battle.

## III

(1) Rudy Davis contends that the evidence against him is *de minimis.*

Defendant Rudy Davis claims that the direct evidence against him was insignificant when compared with similar-acts evidence and other evidence improperly admitted against him. The people do not respond directly to this contention other than to claim that the similar-acts and other evidence was properly admitted.

As to the testimony of Wiley Reed that he made two payoffs for Milton Battle to defendant Rudy Davis and picked up an $800 ring for Battle to give to Rudy Davis, defendant Rudy Davis claims that it was "contradicted by a considerable body of other evidence in the case, including Milton Battle's testimony repudiating his entire story concerning these alleged payoffs". Regardless of evidence to the contrary, Reed's testimony implicates Rudy Davis, and its weight and credibility was for the jury to determine. *People v Way,* 303 Mich 303, 306; 6 NW2d 523 (1942), *People v Smalls,* 61 Mich App 53; 232 NW2d 298 (1975).

Narcotics dealer Alabama Red (Roy McNeal) testified that he had an arrangement with defendants Mitchell and Rudy Davis whereby he received from them 50% of all narcotics and money confiscated in raids on other narcotics dealers set up by McNeal. While it is true that much of Roy McNeal's testimony at the preliminary examina-

tion and during trial was discredited on cross-examination, the defense brief is incorrect in implying that McNeal repudiated his testimony as to the deal with Rudy Davis. While McNeal admitted that he was never actually handed money or narcotics by Rudy Davis in person, Rudy Davis did accompany defendant Mitchell once when Mitchell made such a delivery, and McNeal never retracted his contention that a deal had been made. It was for the jury to pass on the weight and credibility of the testimony. *Id.*

Likewise, the validity of the incriminating testimony of Alice Bailey James, minor as it was, was for the jury to weigh (she testified to part of a conversation between Rudy Davis and deceased coconspirator George Dudley, also known as Texas Slim).

Conspiracy is by its nature a difficult crime to prove, and, if the other evidence was properly admitted, it should make no difference that there was more of it, by "volume", than the direct evidence of participation in the charged conspiracies.

It may be indicative of the jury's proper treatment of the similar-acts testimony and the lack of prejudice to defendant Rudy Davis that in fact he was acquitted of conspiracy to deliver narcotics and convicted only of conspiracy to obstruct justice, although contrary interpretations of this result are plausible.

(2) Rudy Davis also challenges the propriety of the admission of evidence of similar acts.

Prosecution witness Carolyn Boyd testified that

she and Harold Chapman made $100,000 from narcotics supplied to them by defendant Rudy Davis during 1971, the first year in which he supplied them. Chapman also testified that Rudy Davis supplied him with narcotics, describing his arrangement with Rudy Davis whereby Rudy Davis supplied him with narcotics which he sold on a regular basis, giving Rudy Davis half of the profit. Rudy Davis contended in response to this that Chapman merely worked for him as an informer.

Defendant Rudy Davis objected to the admission of the testimony of these witnesses because they were not conconspirators and the testimony was highly prejudicial and dealt with misconduct not charged in the indictment. Other defendants interposed objections, but no prejudice to them resulted because the witnesses did not refer to the other defendants, and cautionary instructions were given to the effect that their testimony was only to be used against defendant Rudy Davis.

The evidence first was admitted by the trial court as probative of guilt on both counts in the indictment. The court later instructed the jury that this testimony was not evidence of direct participation in the charged conspiracy but was evidence of similar acts admitted for the limited purpose of showing that defendant Rudy Davis acted purposefully and that it showed that his actions were the result of a characteristic scheme, plan, or system and would tend to show his intent to enter into the illegal agreement charged in the indictment.

As the parties agree, this evidence was admissible only under the similar-acts statute in effect at the time of trial, MCL 768.27; MSA 28.1050, now

embodied in MRE 404(b). *People v Major,* 407 Mich 394; 285 NW2d 660 (1979).

In *McCrea, supra,* 250, the defendant made a similar claim, contending that it was improper to admit evidence showing a separate and distinct offense from that of the charged conspiracy. There, as in the instant case, the testimony concerned transactions between the defendant and individuals who were not codefendants or alleged coconspirators. The trial court in *McCrea* admitted the evidence as having a bearing on the defendant's intent and as being probative of a general plan or scheme.

We find that *McCrea* controls the issue in the instant case. The evidence of the Chapman conspiracy was properly admitted, and the jury was properly instructed as to its use.

Defendant Rudy Davis complains of the admission of various other evidence, but a careful review of the record reveals that no error requiring reversal occurred.

## IV

Defendant police officer Robert Mitchell claims that he is entitled to a new trial because of an erroneous jury instruction which deprived him of a defense to much of the evidence presented against him. We disagree.

The trial court instructed the jury that "[a] police officer is not licensed by his employment to give narcotics to any person for human consumption. To do so is, itself, illegal".

Defendant Mitchell contends that this instruc-

tion is erroneous because of the statutory exemption embodied in MCL 335.356(3); MSA 18.1070(56)(3), which provides:

"No liability is imposed by this act upon any authorized state, county or local officer engaged in the lawful performance of his duties."

Defendant Mitchell's claim rests on the premise that his delivery of narcotics to informants in exchange for information was done in the lawful performance of his duties (defendant admitted making such deliveries). Evidence was introduced during trial which showed that the practice in question was not officially authorized, and, therefore, we do not consider the activity to be exempted from liability by the statute. We note also that evidence was presented, pro and con, as to whether the practice was commonly followed in spite of the lack of official sanction. The trial court instructed the jury that if defendant Mitchell believed in good faith that his conduct was lawful he could not be found guilty of entering into a conspiracy to do an unlawful act and also that defendant Mitchell was not charged with delivery but with conspiracy to deliver.[1]

---

[1] The relevant jury instructions were given as follows:

"With respect to those to whom Mr. Mitchell testified he did give narcotics, I caution you that none of them, except for Peaches Miles, is named as a coconspirator, and that as to her you should understand that it is your task to determine if she was [sic] a coconspirator in Count I or Count II, and if the particular conduct alleged was [sic] in furtherance of either conspiracy charged here or not.

"Furthermore, let me caution you as follows: A police officer is not licensed by his employment to give narcotics to any person for human consumption. To do so is, itself, illegal. However, you must understand that neither Robert Mitchell nor Rudy Davis nor any other defendant is here charged with the actual unlawful delivery of narcotics. Defendants are, instead, charged only with entering into an unlawful agreement to deliver narcotics. Whether or not an agreement to deliver narcotics is itself, a crime, depends on the state of mind of the person agreeing to so deliver the narcotics. If the person

We find, therefore, that the jury was instructed properly regarding the treatment of defendant Mitchell's admission that he delivered narcotics to informants in exchange for information. Recalling that the theory of the prosecution was that the defendant police officers participated in the conspiracies by harassing rivals of favored drug dealers, the activity in question well may have been in furtherance of the conspiracies. Whether it was, is a question which was properly before the jury, and defendant Mitchell has not presented this Court with authority or facts which convince us otherwise.

## V

Defendants argue that they are entitled to a new trial because a denial of due process resulted from the selective use of grants of immunity to certain prosecution witnesses and the denial of immunity to defense witnesses. Defendants failed to justify such grants of immunity during trial and have failed to demonstrate prejudice resulting from the denials of immunity on appeal.

honestly believes it is lawful for him to do so, even if he is wrong, the mere agreement to do so is not a crime. On the other hand, if one honestly believes or knows that it is illegal to so deliver narcotics, even if he has a very noble and good reason for doing so, it would be unlawful to enter into an agreement to so violate the law.

"You are instructed, therefore, that the mere giving of narcotics by a defendant to another, however illegal the act itself might be, would not itself prove guilt in Count I. And this is so even if the recipient who agreed to receive the narcotics was [sic] a named coconspirator. For such testimony to prove guilt, you would first have to be satisfied beyond a reasonable doubt that both parties entered into the agreement in order to further the purpose of the conspiracy charged here. And, secondly, that the defendant seriously entered into the agreement and that he did so knowing or honestly believing that it would be illegal for him to so deliver narcotics. Again, what is important is what one actually believes the law is rather than what one might believe the law should be."

By legislative mandate, authority to request a court order granting immunity from criminal prosecution rests exclusively in the discretion of the prosecuting attorney. MCL 780.701; MSA 28.1287(101), *People v Watkins,* 78 Mich App 89; 259 NW2d 381 (1977), *lv den* 406 Mich 954 (1979).

Federal case law indicates that under certain circumstances the prosecutor may be found to abuse his discretion to petition the court for a grant or denial of immunity so as to constitute a denial of due process to a defendant. *United States v Morrison,* 535 F2d 223 (CA 3, 1976), *United States v Herman,* 589 F2d 1191 (CA 3, 1978), *United States v DePalma,* 476 F Supp 775 (SD NY, 1979). Under these cases, due process requires that a defendant be entitled to the benefit of immunity for witnesses in two types of cases: first, where prosecutorial misconduct results in the suppression of testimony favorable to the defendant (as in *Morrison,* where the prosecutor successfully intimidated a key defense witness), and, second, where a defendant makes a substantial evidentiary showing that a grant of immunity is necessary in order to obtain exculpatory testimony that is important to the defendant's case.

Both of the situations posed above are consistent with the acknowledged role of the prosecutor as an officer of the court in acting in the public interest. The prosecution has a duty to protect the innocent as well as to convict the guilty, and the use of the power to petition the court should not be used to suppress the truth. The policy consideration against such a use of immunity is, or course, that criminals ordinarily should not be exempted from responsibility for their criminal acts. Thus, it is only under extraordinary circumstances that im-

munity should be used at all (whether for prosecution or defense witnesses).

The two rationales advanced above are, in fact, closely related. Once a defendant makes a strong showing of the need for immunity to allow essential testimony to be presented on his behalf, a prosecutor's refusal to petition the court for immunity may rise to the level of a deliberate attempt to distort the truth-finding process as discussed in *Herman.*

With respect to the initial defense motion, defendants pointed to no specifics which would have justified grants of immunity at that time. The trial court stated as much in its ruling and indicated that if facts justifying such a grant developed during trial defendants' motion could be renewed. Certainly, neither the trial court nor the prosecution can be found to have acted improperly where there was not even an alleged specific justification before them for providing immunity.

Defendants assert that witnesses James Martin and officer Craig Pollard should have been granted immunity. With respect to witness James Martin, defendants also complain that Martin "apparently" was instructed by the trial court that he could not answer some questions and assert his Fifth Amendment rights as to others. We find no support for this contention in the record. In fact, the people's view of Martin's refusal to testify is more likely correct, and that is that Martin's own attorney advised him to remain silent. Furthermore, the trial court allowed Martin to assert his right to remain silent to an apparently nonincriminating question on the ground that it could form a link in the chain. Defendants' briefs ne-

glect to mention the court's justification of the exercise of the right and gives the misleading impression that the trial court had no reason to permit the witness to refuse to answer.

Defendants' only contention as to the substance of Martin's testimony was that it went to the credibility of a key prosecution witness. This contention appears to be an insufficient justification. See *Government of Virgin Islands v Smith,* 615 F2d 964, 972-973 (CA 3, 1980).

While a defendant may find himself in a "Catch-22" situation (unable to present evidence to demonstrate a need for immunity without first obtaining such immunity), it appears that the policy against granting immunity outweighs a speculative, prophylactic use of immunity power.

With respect to the testimony of officer Craig Pollard, it is clear that defendants suffered no prejudice. Defendants make a specific claim of justification in that Pollard would have testified in support of the contention that it was common practice for police officers to give narcotics to informants in exchange for information. In fact, there was testimony to that effect given by other witnesses, rendering Pollard's testimony cumulative. Furthermore, Pollard testified that he knew of no other officer engaging in that practice, and so the extent of this testimony would obviously have been only that he had done so himself. This hardly appears to be sufficient justification for a grant of immunity. It is also quite likely that the jury realized exactly why Pollard refused to testify regarding the practice in question, so that they knew what his testimony would have been even

without hearing it, although we do not dispose of the issue on that basis.

Since there was no adequate justification for a grant of immunity to witness Pollard, the failure to petition for or grant immunity cannot constitute an abuse of discretion on the part of the prosecution or the trial court.

## VI

Defendants claim that the trial court erred by denying their request for a bill of particulars and that reversal is required on that ground.

There are two situations in which it is error for the trial court to deny such a motion. First, where the defendants were charged by the short-form information or indictment they have a mandatory right to a "seasonably requested" bill of particulars. MCL 767.44; MSA 28.984, *People v Clark,* 85 Mich App 96, 100; 270 NW2d 717 (1978), *People v Jones,* 75 Mich App 261, 268-269; 254 NW2d 863 (1977), *lv den* 402 Mich 822 (1977), *People v Tenerowicz,* 266 Mich 276, 287-288; 253 NW 296 (1934). Second, the denial of a motion for a bill of particulars where a long-form indictment is used is erroneous where it constitutes an abuse of discretion by the trial judge. *Tenerowicz, supra,* 288, *Jones, supra,* 269.

The defendants first contend that they were charged in the statutory short form. MCL 767.44; MSA 28.984 states that the following is the short-form method of charging a conspiracy:

"Conspiracy—A. B. and C. D. conspired together to

murder E. F. or to steal the property of E. F. or to rob E. F. (as the case may be)."

Count I of the indictment charged the defendants with conspiring among themselves and with others to sell, manufacture, deliver, or possess, with the intent to deliver, narcotic drugs to one another and "divers other persons".

Count II of the indictment charged the defendants with conspiring together to obstruct justice by wilfully and unlawfully bribing, assaulting, attempting to murder, murdering, and hindering the arrest of persons for narcotics violations and "divers other crimes" for the purpose of obstructing and hindering justice.

In addition, each count sets forth a starting and an ending date for the alleged conspiracy and sets forth certain specific locations (although each count includes an open-ended reference to "divers other locations").

The indictment in *People v Missouri,* 100 Mich App 310; 299 NW2d 346 (1980), *lv den* 411 Mich 1039 (1981), had two counts which, with respect to the detail in which each count was set forth, are indistinguishable from the first count in the instant case. In addition to the precise statutory form set forth in MCL 767.44; MSA 28.984, the indictment in *Missouri* stated the place and time that the two conspiracies were alleged to have occurred pursuant to MCL 767.45; MSA 28.985. The *Missouri* Court found that while the indictment in that case was sufficient to charge the offenses of conspiracy, its minimum content led the Court to conclude that the indictment was in the statutory short form. *Missouri, supra,* 331, fn 5.

It would be possible to take the view that any

information included in the indictment beyond what is stated in the statute as the short form would make the indictment one in "long form". Even if this view is taken, the instant case (like *Missouri*) presents a situation where the specificity of the indictment was minimal. The defendants were informed of the "nature of the crime" only insofar as to know that it was a conspiracy. The people's argument that the indictment was very specific by giving dates and locations must be regarded as unrealistic.

An examination of the "specific" dates shows that they are merely approximate starting and finishing times which are unconnected to any specific event. In fact, the dates were amended at the close of proofs. The "specific" locations were given, but those numerous locations were not tied to any specific events, and at the close of proofs many of the alleged locations were dropped from one or both counts. In addition, both counts included the catch-all, "divers other locations".

The only other "specificity" is a list of crimes allegedly committed in furtherance of the Count II conspiracy. While naming a number of crimes, this list gives no indication of when, where, or how any of the crimes were committed or by whom they were committed. The list also included as a catch-all, "divers other crimes".

It should be clear from these facts that it would be an abuse of discretion to deny defendants a bill of particulars setting forth with some degree of specificity the acts by which they are connected with or are deemed to be participants in the conspiracy.

This is not to say that the indictment itself is invalid, since an indictment for conspiracy may be as vague as is the conspiracy charged. *Tenerowicz, supra*, 285.

Although our analysis seems to favor defendants up to this point, the question of whether they are entitled to reversal rests on whether they have demonstrated actual prejudice resulting from the error. *Missouri, supra.* It appears they have not.

The people rely on the extensive discovery materials made available to the defense as satisfying the purpose which would have been served by a bill of particulars. Discovery included complete transcripts of the preliminary examinations and transcripts of grand jury proceedings. While the defense certainly was given a great deal of specific information, it is possible that the indiscriminate provision of a vast amount of unwieldy information may be almost as unfair as the provision of insufficient information. Still, none of the allegedly impermissible proofs appears to have been prejudicially mishandled by the trial court as a result of the lack of a bill of particulars.

Notice should be taken that in *Missouri* the error committed in denying the request for a bill of particulars was cured by the fact that the defendants were provided with a detailed statement of the prosecution's theory of the case and a two-day hearing was held to clarify which of the acts alleged to have been committed related to which of the two counts of the indictment. No such hearing was conducted in the instant case, but that aspect of *Missouri* is distinguishable because the two counts there were so closely related that confusion regarding which acts went to which count was inherent. In fact, the substance of both of the counts in *Missouri* is contained in the single first count of the instant case.

Since no prejudice has been shown to result from the trial court's error in denying defendants' request for a bill of particulars, they are not

entitled to a new trial on that ground. *Missouri, supra, Tenerowicz, supra.*

## VII

Defendants Bivins, Iaconnelli, Harold Davis, and Turner claim that their convictions must be reversed because, although they were charged with involvement in a single mass conspiracy, the proofs presented during trial demonstrated, at best, the existence of multiple, separate conspiracies. The people's response to this claim is that the jury was carefully instructed to determine the extent of the single conspiracy charged and was presented with ample evidence to support the involvement of each convicted defendant in the conspiracy. The question of each of these defendants' involvement in the alleged mass conspiracy must be dealt with individually due to the differing circumstances under which they appear to have been involved.

(1) Defendant Bivins attempts to characterize the instant case as being controlled by *Kotteakos v United States,* 328 US 750; 66 S Ct 1239; 90 L Ed 1557 (1946). In that case, a number of defendants were charged with conspiracy to violate provisions of the National Housing Act by virtue of filing fraudulent claims for loans under the act. In *Kotteakos,* the only connection among various defendants was that the fraudulent claims all were filed through one Mr. Brown, who functioned as a broker in placing the fraudulent applications, presenting a classic "wheel conspiracy" question. Mr. Brown was the "hub" by which the various individual conspiracies (or "spokes" of the "wheel") were connected, but the Court in *Kotteakos* held that more than the fact that one man participated

in the various conspiracies was necessary to justify the conviction of each conspirator of a single mass conspiracy.

Applying a wheel conspiracy analysis to defendant Bivins' conviction, the dispositive fact is that Bivins was employed directly by Milton Battle as Battle's assistant and bodyguard. Under defendant's own authority, the central or "hub" members of the individual conspiracies are guilty of a single mass conspiracy. The circumstantial evidence allows a fair inference that Bivins was aware of the various individual conspiracies which he attempts to characterize as unconnected spokes and thus his conviction should not be reversed on grounds of his being merely involved in a separate conspiracy rather than the single mass conspiracy charged in the indictment.

(2) Defendant Iaconnelli makes essentially the same argument as defendant Bivins, and his claim of error fails for the same reason. According to the testimony of prosecution witness Wiley Reed, Iaconnelli participated in transactions whereby money was paid for large quantities of cocaine for distribution by Milton Battle. Battle himself testified to defendant Iaconnelli's extensive involvement in the conspiracy. It can be fairly inferred from this and other testimony that Iaconnelli, as well as Battle and Bivins, were part of the central hub of the charged conspiracy.

(3) A somewhat different analysis of this issue applies to defendant Harold Davis. It appears from the evidence presented that Davis was an independent dealer who obtained narcotics from Milton Battle. Testimony showed that Harold Davis received narcotics from Milton Battle on a regular

basis through Wiley Reed and others, and, on occasion, directly from Battle himself. Roy McNeal, a key prosecution witness, testified that Harold Davis had no "arrangement" with Battle and that Davis "was dealing on his own. He was an independent dealer."

McNeal's testimony does not preclude a finding that Harold Davis was a member of the mass conspiracy charged. If other evidence showed circumstances from which it could be fairly inferred that Davis had agreed in fact to support and promote the central conspiracy, he could be found to have been a part of it. We find no such evidence in the record, and we are compelled, therefore, to reverse the conviction of defendant Davis.

The question of single versus multiple conspiracies was recently dealt with in *Missouri, supra.* In that case, the question was characterized as whether there was an impermissible variance between the proofs and the indictment. This Court found sufficient evidence of an agreement in fact among the various coconspirators, *id.,* 343-346, but went on to acknowledge that a variation between the proofs and indictment would have prejudiced those coconspirators at the retail level of the narcotics distribution chain. This is consistent with the holding in *Kotteakos,* where the "spoke" conspirators had no interest in each other's success and no evidence was presented to show an agreement in fact between the various conspirators.

Notice should also be taken of *People v Atley,* 392 Mich 298; 220 NW2d 465 (1974). *Atley* makes it clear that a conspiracy requires more than knowledge that another has an unlawful purpose.

In addition, it is necessary to show that the respective conspirators intended to further, promote, or cooperate in the unlawful enterprise. Direct proof or the establishment of a formal agreement is not necessary, but the evidence must warrant a fair inference that an agreement in fact existed. *Id.,* 311.

The Supreme Court in *Atley* disagreed over whether such an agreement in fact could be inferred from the circumstances of that case, a majority finding that it could not. We find the circumstantial evidence in the instant case even less compelling, and therefore we reverse defendant Harold Davis's conviction of the conspiracy charged in Count I.

(4) While other testimony showed defendant Harold Turner to be guilty of extensive illegal trafficking in narcotics, we must decide whether the evidence shows that he participated in the central conspiracy charged in Count I.

The testimony shows that at one point during the time of the alleged conspiracies, Roy McNeal and Milton Battle had a disagreement and terminated their "partnership". McNeal then went into a short-lived partnership with Turner, who apparently was an alternate source of narcotics. Testimony shows a single transaction during this short time whereby narcotics were supplied to the Turner-McNeal partnership from Milton Battle's organization, while, for the most part, supplies came from Turner.

Testimony also shows a total of two meetings between Battle and Turner, and the only communication testified to was Battle's admission that

Turner informed Battle that police officer Robert Mitchell could be bribed.

One witness testified that she accompanied Harold Turner and Roy McNeal to an encounter with convicted coconspirator officer Robert Mitchell in convicted coconspirator Erskine Haslip's shoe store where McNeal, in the presence of Turner and the testifying witness, paid officer Mitchell some $250 to $300.

It was also established that several underlings were alternately employed in Turner's drug operation and in the Battle-McNeal operation, though not in both at the same time.

In addition, testimony tended to show that Turner frequented the Pingree Street address where the McNeal operation was in progress, even outside of the time period when Turner and McNeal were partners.

Although we consider it to be a close question, we find the above evidence sufficient to present a question of fact for the jury to decide whether defendant Turner was a participant in the charged mass conspiracy. Our finding of sufficiency is based on the cumulative consideration of the evidence in question, as was the case in *United States v Tramunti,* 513 F2d 1087 (CA 2, 1975).

In *Tramunti,* the defendants argued that the evidence showed the existence of two independent and competing conspiracies. The United States Court of Appeals decided that, while the evidence indicated that there were two spheres of operation in the narcotics conspiracy which was established, there was sufficient proof of mutual dependence

and assistance to warrant the treatment of the two spheres as one general business venture. Key facts establishing the close relationship between the two spheres were: (1) one witness testified that he worked for both groups, though never for both at the same time, and he moved from the employ of one group to the other with relative ease; (2) a principal partner from one of the "spheres" participated in the activities of the other sphere on several occasions; (3) a principal partner of one sphere had knowledge of the details of the operation of the other sphere; and (4) the two organizations in *Tramunti* were linked by sales to common distributors.

The issue in the instant case is remarkably similar to that in *Tramunti.* The evidence showed that defendant Turner operated a narcotics business. The evidence also showed a narcotics operation being carried on by Milton Battle in partnership with Roy McNeal. These operations are analogous to the two "spheres" in *Tramunti.* We regard the evidence in *Tramunti* to be stronger than that in the instant case, but the evidence before us is still sufficient to warrant an inference that the defendants in the case at bar belonged to a single loosely knit conspiracy.

We note that both *Kotteakos* and *Atley* involve defendants who were engaged in a "one shot" venture (with the exception of the central figure in *Kotteakos),* while the defendants in *Tramunti* and the instant case were involved in an ongoing operation. The evidence allows a fair inference that an agreement in fact existed among the defendants and that defendant Turner was a party to that agreement.

## VIII

There is no merit to defendant Haslip's argument that the trial court erred in refusing to grant his motions for a directed verdict, a judgment notwithstanding the verdict, or for a new trial. Defendant Haslip's argument rests on the premise that the testimony of witness Roy McNeal was inherently unreliable, but McNeal's credibility is a matter to be weighed by the jury. *Way, supra, Smalls, supra.*

It is true that McNeal was shown to have made inconsistent statements both prior to and during the trial, but such statements were put before the triers of fact.

Under *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979), as in *Smalls, supra,* the standard for reviewing the sufficiency of the evidence is whether the evidence, when taken in the light most favorable to the prosecution, would justify a rational trier of fact in finding beyond a reasonable doubt that all the elements of the crime are present.

One reason for taking the evidence in the light most favorable to the prosecution in applying the *Hampton* test is that the trier of fact is to determine the credibility of the witnesses. While the question of credibility in the instant case is more complex than in *Smalls* due to the prior inconsistent statements, the question is still a credibility contest between the prosecution's and defendants' witnesses.

Defendant Haslip does not contend that the elements of the crime have not been shown, but

only that the testimony in support thereof was not believable. Defendant Haslip is not entitled to reversal on this issue.

## IX

Defendant Harold Davis claims that the trial court committed error requiring reversal by refusing to suppress evidence of his prior criminal record. That record consisted of convictions of larceny from an automobile in 1952, larceny from a building in 1956, larceny from a building in 1965, attempted possession of heroin in 1971, and attempted possession of heroin in 1973.

Prior to trial, defendants Harold Davis and Rudy Davis moved to suppress evidence of their prior convictions. The trial court denied the requests and issued a written opinion stating its reasons for doing so.[2] The trial court determined

[2] The text of the trial court's opinion is as follows:

"In this case defendants Harold Davis and Rudy Davis have filed motions seeking to suppress their respective criminal records should they, at the trial, elect to testify and be subject to cross-examination. On May 5, 1975, this court issued a ruling from the bench denying the motions to suppress and explaining the rationale for its discretionary ruling. The ruling was, and is, that if the defendants do testify, their prior convictions can be brought out once (only) and the prosecution is barred from going into the offenses for which defendants stand convicted.

"This decision leaves the defense free to do two things:

"(1) To bring out the convictions on direct examination, thereby precluding the prosecution from raising it, 'dramatically' or repetitiously, on cross-examination; and,

"(2) To elect, itself, whether or not it wishes to look behind the recitation of a conviction and allude to the date of conviction and the offense for which a defendant was convicted.

"This written summary is prepared to insure that all parties understand the court's decisional guidelines and to elucidate the court's rationale at the request of the attorney for defendant Rudy Davis.

"The court does not hesitate to say that it is in sympathy with the recent decisions which have paved the way for the suppression of criminal records where the effect is more prejudicial than probative.

that to suppress evidence of the prior convictions of these two defendants would result in a distortion of the truth-finding process because many prosecution witnesses had extensive prior records which would be used by the defense for impeachment and because several defendants had "clean" records.

Defendant Rudy Davis, whose record consisted of a single conviction of obstruction of justice, took an appeal from the trial court's ruling. That appeal was finally determined by the Michigan Su-

See, e.g., People v Jackson, 391 Mich 323 [217 NW2d 22] (1974). At the same time, trial courts should retain the right to exercise discretion for there can, indeed, be instances where the proper exercise of discretion makes it only fair for the prosecution to be able to bring out a defendant's prior criminal record. One such recognized 'exception' is where a defendant has a prior perjury conviction. A perjury conviction is obviously very prejudicial; but, at the same time, there is an equal or greater probative purpose in allowing such a record to be brought to a jury's attention.

"This court believes that the unusual circumstances of the instant case offers another type of 'exception' warranting the previously stated ruling and guidelines.

"The preliminary examination transcript in this case reveals that numerous prosecution witnesses have a host of criminal convictions which the defense exploited at great length at the examination and which will properly be brought out at trial, too. All defendants will get the benefit of such impeachment evidence.

"At the same time, many of the 16 defendants in this case do not have prior convictions. Should those without records elect to testify, their 'clean' backgrounds may also be brought out to the jury.

"If the court, in this case, were to suppress criminal records for any defendant so stigmatized, the jury would be likely to regard all defendants to have untarnished pasts. Such an appearance would not only distort reality, but it would also impair the jury's ability to fairly judge the credibility of witnesses who might be called by the prosecution as compared to some who might be called by the defense.

"In this court's discretion, a fair and proper ruling is to allow the convictions of defendants, should they testify, to be brought out, but not unduly exploited. This ruling is designed to balance the competing interests and rights of both sides to this litigation in a manner that promotes fairness and does not mislead layjurors. It leaves the scope of disclosures to the defense so that they can assert some tactical control over that which is prejudicial while, at the same time, the prosecution is protected against the total and misleading suppression of probative evidence."

preme Court by order dated June 19, 1975, in
which the Court ruled that the decision of the trial
court to admit Rudy Davis's record for impeach-
ment under limited circumstances was not an
abuse of discretion.[3]

The people argue in this appeal that the Su-
preme Court ruling is the law of the case which
precludes further inquiry into the trial court's
ruling on the admission of defendant Rudy Davis's
own prior record. It is true that where a legal
issue has been raised in an appeal, it may not be
raised again in a subsequent appeal. *People v
Paintman,* 92 Mich App 412; 285 NW2d 206 (1979).
However, the issue before us is not the precise
question which was dealt with previously. The two
defendants who moved for suppression had very
different prior records. Rudy Davis had a single
conviction, while Harold Davis had several, and
the nature of the crimes are quite different. It may
be possible to find, therefore, that the admission of
Harold Davis's record was an abuse of discretion
while admission of evidence of the single convic-
tion of Rudy Davis was not, and disposition of this
issue cannot be grounded on the doctrine of the
law of the case.

However, we find no abuse of discretion in the
trial court's ruling. It is clear that the trial court
recognized and exercised its discretion, and it is
also clear that the trial court took account of the

---

[3] The text of the order is as follows:
"Leave to appeal granted June 19, 1975. The Court, *sua sponte,*
pursuant to GCR 1963, 865.1(7) hereby reverses that portion of the
May 23, 1975 order of the Court of Appeals which orders suppression
of defendant's prior conviction. The Court is of the opinion that the
decision of the trial judge to admit defendant's criminal record for
impeachment purposes under limited circumstances was not an abuse
of discretion." *People v Rudy Davis,* 394 Mich 790 (1975).

factors enumerated in *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974), which case was noted in the trial court's opinion. The trial court was properly concerned that the truth-finding process would be distorted if defendant Harold Davis's prior record were suppressed. The trial court's ruling was not, as defendant Harold Davis contends, "grossly at variance" with the law of Michigan in 1975, and defendant Harold Davis was not denied a fair trial.

Finally, we note that the correctness of the manner in which the trial court allowed the admission of evidence of the convictions, namely by allowing the prosecution to inquire into the number of convictions and giving the defense the option of bringing out the nature of the crimes, does appear to be the law of the case. We interpret the Supreme Court's opinion, by its mention of "limited circumstances", to sanction the method by which the trial court allowed the evidence to be presented. Since that method was the same as to both defendants, we are convinced that the Supreme Court would have reached the same result had defendant Harold Davis appealed the manner of the admission.

## X

Defendant Harold Turner raises several claims of error regarding the admission of evidence of various statements of coconspirators.

(1) Defendant Turner first claims that the trial court erred by giving the following type of instruction when admitting evidence of various statements:

"Members of the jury, statements made not by this witness but by a third party are hearsay. They are generally not admissible. In this situation, they can be received with an understanding that they are not binding on any defendant before the court unless or until you are to find beyond a reasonable doubt that a conspiracy or conspiracies charged were factually committed.

"Secondly, unless you as factfinders were to determine beyond a reasonable doubt that the speaker and that the parties might be bound by it were members of that conspiracy and you should recall that membership can only be determined factually from one's own acts or statements, and not by hearsay.

"Third, you will have to find beyond a reasonable doubt that the hearsay was made in furtherance of the conspiracy.

"With those restrictions, I am allowing the hearsay in now * * *."

Defendant Turner is correct in asserting that the instruction as given would give the jury a meaningless task to perform. If the jury first determines beyond a reasonable doubt that a conspiracy exists and then determines beyond a reasonable doubt that the declarant and the defendants bound by the statements are members of the conspiracy, defendant Turner's guilt has been established and there is no need to take the final step by considering the statements in question.

If the jury followed the instruction, the effect is to give defendant Turner an even greater protection from properly admitted statements than he is entitled to. Defendant Turner in fact would have been found guilty without consideration of the statements. The error is therefore harmless, and we will not reverse defendant Turner's conviction because of it. GCR 1963, 529.1.

In another case, the same type of instruction

was requested by a defendant, and the request was denied because the instruction was erroneous. *Carbo v United States,* 314 F2d 718, 735-738 (CA 9, 1963). The *Carbo* case does not require reversal in the case at bar but only supports the proposition that the instruction is erroneous. Harmless error analysis applies to the instant case as discussed above. See *United States v Knight,* 416 F2d 1181, 1186 (CA 9, 1969), and cases cited therein.

(2) Defendant Turner next claims that his conviction should be reversed because of a second category of hearsay evidence which was improperly admitted with a defective limiting instruction. On several occasions during the trial, hearsay statements were admitted by the trial court even though the court determined that the statements were not made in furtherance of the conspiracy. The trial court instructed the jury that these statements could not be considered as binding on the defendants to whom the statements referred but that they could be considered as binding on the declarant.

For example, Larry McNeal testified on direct examination that Olivia Sampson once told him that defendant Richard Herold "would bring narcotics by and leave them for Boo Turner (defendant Harold Turner)". Counsel for defendant Turner objected to this hearsay and requested that the jury be instructed to disregard it. The court, upon a showing that Olivia Sampson was alleged to be a coconspirator, instructed the jury as follows:

"Members of the jury, I am instructing you that it can be received only insofar as it bears upon her. As to everyone else, it is hearsay and not binding. Go ahead, Mr. Steele."

Defendant Turner claims that this type of limiting instruction was rejected by the United States Supreme Court in *Bruton v United States,* 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968). A careful reading of *Bruton* reveals that the statement in that case was the confession of a codefendant who did not testify during trial. The oral confession, made to a third party, implicated Bruton in a robbery. The Court decided that Bruton had been denied his Sixth Amendment right of confrontation since the declarant could not be cross-examined because of his refusal to take the stand and that the confession of the codefendant was such a powerfully incriminating statement that the jury would be unable to ignore it in determining Bruton's guilt. *Id.,* 126, 135-136.

In the case at bar, most of the hearsay declarants testified during trial and were subject to cross-examination. Although one declarant, Mr. Pittman, was not available during trial, the statements complained of are not direct confessions of guilt as was true in *Bruton.* The statements were relevant to prove that the declarants were conspirators, and thus the trial court's limited admission was proper. We think that the jury was capable of understanding the infirmities of the hearsay statements in the case at bar and that the jurors could properly follow the limiting instruction as given.

(3) Defendant Turner also claims that the trial court never ruled on the admissibility of many of the statements of coconspirators against Turner but erroneously delegated the duty of determining the admissibility of the evidence to the jury under the cautionary instruction discussed in part (1) above. The people correctly observe that the trial court was aware of the foundational requirements for admission of the statements of coconspirators

against each other, and it is apparent from the record that the trial court ruled implicitly that those foundational requirements had been met wherever such statements were admitted into evidence with cautionary instructions. The instruction to the jury that it must first find the existence of the conspiracy and the fact of a defendant's involvement by independent evidence was the trial court's acknowledgement of the fact that even though there was a proper foundation, the jury could reject some or all of the evidence establishing the foundation, thus rendering it improper to consider the extrajudicial statements. Defendant Turner was not denied protection from such statements but was given a two-stage protection insuring that the statements in question would only be used as the law properly allows. *Knight, supra,* 1185-1186.

Defendant Turner is not entitled to a new trial by reason of the admission of statements made by coconspirators.

## XI

Defendant Harold Turner claims that the trial court committed plain error by failing to instruct the jury that defendant Turner was responsible only for an agreement with other coconspirators as intended by him but was not responsible for a prior agreement or any acts or statements in furtherance of such a prior agreement. Specifically, defendant claims that the trial court erred by failing to give CJI 10:1:07, which reads as follows:

"A person who joins a conspiracy is not liable for or bound by the agreement existing before his joining and becoming a member of the conspiracy. He is responsible

only for the agreement with the conspirators which he intended at the time of joining. Evidence of any acts or declarations of other conspirators prior to the time such person becomes a member of the conspiracy may be considered by you in determining the nature, objectives and purposes of the conspiracy after such time, but for no other purpose."

The people contend that defendant Turner did not request this instruction and failed to object to its absence from the jury charge. The people also claim it to be an inaccurate statement of the law, and so the failure to give it could not have been error.

By a written request filed on December 1, 1975, defendant Turner requested that the first two sentences of this instruction be given to the jury. In fact, the trial court gave a charge regarding one who joins a conspiracy after its inception to the effect that one is bound by all acts done in furtherance of the conspiracy prior to his joining it:

"In Michigan, it is the law that one who joins a conspiracy after it has been formed is as guilty as though he were an original conspirator and is bound by all acts prior to his joining or while a member so long as the acts were in furtherance of the conspiracy. This is so even if he did not know all of the conspirators or participate in all of the objects of the conspiracy."

The instruction given by the trial court is consistent with numerous federal cases on conspiracy. See *Knight, supra,* and cases cited therein. Michigan case law appears to be in accord. *People v Ryan,* 307 Mich 610, 612; 12 NW2d 474 (1943).

The instruction as given was correct and properly informed the jury of the applicable law. The Michigan Criminal Jury Instructions are proposed, not mandatory. Supreme Court Administrative

Orders 1977-1, 399 Mich lxxii, and 1978-5, 402 Mich lxxxvii. Furthermore, those instructions may be incorrect. See *People v Hernandez,* 80 Mich App 465, 474; 264 NW2d 343 (1978).

We do not necessarily consider the two instructions in question to be inconsistent. CJI 10:1:07 would have instructed the jury to use evidence of the activities of coconspirators prior to defendant Turner's joining the conspiracy to decide whether defendant Turner's agreement encompassed the mass conspiracy charged or only constituted some lesser activity, such as an independent conspiracy as we have found with regard to defendant Harold Davis (see Issue VIII above). By reason of its instruction on the finding of single versus multiple conspiracies, the trial court gave the substantive protection of the requested instruction, and defendant Turner is not entitled to reversal. *McCrea, supra,* 255-256.

Once it is determined that a defendant intended to engage in the major charged conspiracy, he is as guilty as if he had been a conspirator from the start. *Ryan, supra.* Defendant Turner claims that the prejudice suffered as a result of numerous execution-style murders and other acts perpetrated before he joined the conspiracy was incurable but that once it is established that he joined the ongoing conspiracy he is responsible for all acts done in furtherance of the conspiracy. The prejudice complained of is significantly less than would be the case where a defendant's prior criminal record is admitted, since the jury is well aware that defendant Turner did not directly commit or order the commission of the acts in question. That he is held legally responsible is the consequence, brought upon himself, of his decision to join the conspiracy. This is not to say that defendant

Turner is guilty of murder by reason of the acts of his conconspirators, but only that he is guilty of agreeing to that which his conconspirators did. The testimony complained of was properly admitted as acts done in furtherance of the conspiracy.

## XII

For the reasons stated above, the convictions of defendants Richard Herold and Harold Davis are reversed. The convictions of the other defendants are affirmed, without prejudice to defendant Turner's right to pursue, in the trial court, his motion for an evidentiary hearing on the issue of ineffective assistance of counsel. We do not retain jurisdiction.

Affirmed in part and reversed in part.